**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ruben ROCHA, Thomas Padilla, Hector Garcia–Garcia, Johnny Robert Hinojosa, and Jose Santos Gallegos, Defendants–Appellants.**

**No. 89–1712.**

United States Court of Appeals,
Fifth Circuit.

Oct. 22, 1990.

220

**224**

Jose Santos Gallegos, El Reno, Okl., pro se.

Larry Sauer, Austin, Tex., for defendant-appellant Padilla.

Bentley C. Kelly, III, Dallas, Tex. (Court-appointed), for defendant-appellant Hinojosa.

Stacy L. Brainin, Haynes & Boone, Dallas, Tex. (Court-appointed), for defendant-appellant Rocha.

Fred Bennett, Dallas, Tex. (Court-appointed), for defendant-appellant Garcia–Garcia.

C. Steven Matlock, Jr., Jonathan L. Snare, Jackson & Walker (Court-appointed), for defendant-appellant Gallegos.

Lynn Hastins, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before BROWN, POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Defendants-appellants Ruben Rocha ("Rocha"), Thomas Padilla ("Padilla"), Hector Garcia–Garcia ("Garcia"), Johnny Robert Hinojosa ("Hinojosa") and Jose Santos Gallegos ("Gallegos") were convicted on various federal criminal charges arising from the kidnapping of Michael Baker. All of the defendants have appealed their convictions and sentences on numerous grounds. Finding no reversible error, we affirm each defendant's conviction and sentence.

## I. FACTS AND PROCEDURAL HISTORY

This case involves the kidnapping of seventeen year old Michael Baker ("Baker"). The events leading to the kidnapping are significant. Defendant Padilla entered into an agreement whereby Padilla would deliver thirty (30) kilos of cocaine to Baker's uncle, Tony Rodriguez ("Rodriguez"), in Michigan. In return, Rodriguez agreed to pay Padilla for the cocaine from the proceeds of the cocaine sales. In November of 1988, Padilla delivered the cocaine to Rodriguez. However, Rodriguez found that he was unable to sell the cocaine at a price sufficient to cover the amount he owed to Padilla. To avoid Padilla, Rodriguez disappeared.

As the weeks passed without word from Rodriguez, Padilla made repeated telephone calls and visits to Bernice English ("English"), Rodriguez's sister and Baker's mother. At one point, Padilla threatened to hold English until Rodriguez paid his debt. English was frightened enough that she moved herself and her three younger children to California in January of 1989. Baker begged his mother to allow him to stay in Michigan to complete his senior year of high school. English acquiesced but admonished Baker to be careful of Padilla. English rented her River Rouge, Michigan, home to friends, and Baker went to live with his grandfather near Detroit.

On March 16, 1989, Baker drove to his old home in River Rouge, Michigan, to pick up mail. Baker retrieved the mail from

inside the residence, and then returned to sit in his car which he had parked in the driveway. As Baker was sorting through the mail, Padilla and defendant Hinojosa drove up in a rented Toyota, blocking Baker's car. Padilla demanded to know where he could find Rodriguez, but Baker claimed he did not know. Promising to leave Baker alone if Baker would show Padilla the location of his grandfather's house, Padilla convinced Baker to get into the Toyota. As a further incentive, Padilla pointed to two vehicles parked down the street and threatened that if Baker refused to go with Padilla, the Colombians inside those two cars would capture and harm Baker. Baker believed Padilla's threats and reluctantly assented.

Once Baker climbed into the Toyota with Padilla and Hinojosa, Padilla refused to take Baker to his grandfather's house. Padilla stated that Baker was going to Texas with them until Padilla could contact Rodriguez. Padilla and Hinojosa took Baker to a motel room where Padilla and Hinojosa gathered their belongings, including a gun which Hinojosa retrieved from a ceiling panel. Padilla and Hinojosa then drove Baker across the Michigan border en route to Texas.

During the trip to Texas, Padilla stopped several times to make telephone calls to California in an attempt to contact Rodriguez. After eliciting English's telephone number from Baker, Padilla called English to inform her that he had captured Baker. Padilla stated that he would release Baker unharmed if Rodriguez would contact him. English relayed this information to Rodriguez, who immediately went to English's house to await a telephone call from Padilla. When Padilla called, Padilla told Rodriguez to fly to Texas and bring the money

for the cocaine. If Rodriguez didn't show up with the money, Padilla threatened to kill Baker. After this telephone call, Rodriguez contacted federal authorities. On the morning of March 18, 1989, Rodriguez flew to Dallas where Federal Bureau of Investigation ("FBI") agents met him. The agents checked Rodriguez into a room at the Marriott Hotel and set up surveillance.

Meanwhile, Padilla, Hinojosa and Baker had arrived in Dallas, Texas, on the evening of March 17, 1989. Upon their arrival, Padilla dropped off Hinojosa and picked up defendant Rocha. Padilla and Rocha took Baker to the Value Inn Motel in Arlington, Texas, and Rocha checked them into a motel room. Padilla went away for a few hours leaving Rocha alone with Baker. When Padilla later returned, he brought defendant Gallegos and an unidentified male with him. These men confined Baker inside the motel room throughout the night.

On the morning of March 18, 1989, Rodriguez attempted to contact Padilla by calling Padilla's beeper number and, upon instructions from the FBI, entered the telephone number to the FBI hello phone.[1] Padilla called several times to set up a meeting with Rodriguez. During two telephone calls, Padilla told Rodriguez to wait for a call from defendant Garcia regarding the exchange. Also, Padilla repeatedly questioned Rodriguez about Rodriguez's hotel room number, but on instructions from the FBI, Rodriguez tried to be evasive. At first, Rodriguez gave only a partial room number of 44.[2] During a later telephone call, Padilla persisted and Rodriguez finally revealed that the correct number was 448.

At some point in the early afternoon on March 18, Padilla gave certain directions to

1. The FBI "hello phone" is an unlisted private telephone line to a telephone located in FBI offices. Agents made arrangements so that any incoming call to the hello phone would be automatically forwarded to the Marriott Hotel and a trace started. Thus, a call to the hello phone number on March 18, 1989, would be answered by the Marriott Hotel staff and the unsuspecting caller would be oblivious to the fact that the call was directed to the FBI before being forwarded to the Marriott Hotel.

2. This fact is significant for two reasons. First, Padilla's strong efforts to try to get Rodriguez's room number led to the agents' suspicion that Padilla would send someone to Rodriguez's room. Second, the partial room number was written on a piece of paper found in defendant Rocha's pocket at the time of his arrest.

Rocha, Gallegos and an unidentified man. Baker testified that he thought Padilla gave the three men Rodriguez's room number at the Marriott Hotel and directed them to go meet Rodriguez. Rocha, Gallegos and the third man left the Value Inn while Padilla remained with Baker. Throughout the afternoon, Padilla drove Baker around the area. Each time Padilla's beeper sounded, Padilla made a telephone call. A few hours later, Padilla stopped at Hinojosa's apartment. As Hinojosa approached the car, Padilla yelled at Hinojosa to "get the throwaway" [3] and made a hand gesture imitating a gun. Hinojosa went into the apartment and returned with a gun, placing it inside his boot. While driving away, Padilla and Hinojosa agreed that Hinojosa would leave Padilla and Baker at a restaurant and then go to Padilla's house to retrieve another gun. Once Hinojosa completed this task, Padilla drove Hinojosa and Baker to meet the three men that Padilla dispatched from the Value Inn earlier—Rocha, Gallegos and the unidentified man. Hinojosa concealed the second gun under a shirt, and joined the other three already seated in a brown Lincoln Continental.

A short time after 4:00 p.m., five calls were made to the hello phone within a short period of time.[4] After receiving information that these five calls originated from a telephone in the basement of the Marriott Hotel, an agent was dispatched to investigate. The agent observed two individuals at a telephone: one, later identified as Rocha, and another, later identified as Gallegos. The agent noticed that the two individuals would converse and then the first individual (Rocha) would speak into the telephone. The agent left the area and told other agents that he thought one of the individuals he observed might be Baker. In an attempt to ascertain whether the individual was indeed Baker, agents sent Rodriguez to the basement with instructions to walk casually by the individuals and to give a designated signal if Baker

was present. Rodriguez did not give the signal and left the area. Rocha and Gallegos, apparently noticing both Rodriguez and the agents, proceeded to quickly leave the basement. The agents, suspecting that Rocha and Gallegos might notify Padilla, arrested them as they attempted to drive away in the brown Lincoln Continental. A search of the vehicle later revealed a loaded Smith & Wesson 9 millimeter semiautomatic handgun beneath Gallegos' seat and a loaded Smith & Wesson .38 caliber revolver underneath Rocha's seat.

Except for his brief trip to the basement, Rodriguez spent most of the afternoon anxiously waiting for Garcia's call. When Garcia finally telephoned, he mentioned that he had not seen Baker, but he told Rodriguez to bring Padilla's money to a local mall. As directed by Garcia, Rodriguez met Garcia at the Forum 303 Mall. During the ensuing conversation, Garcia stated that he would tell Padilla he had seen the money and "guaranteed" that Baker would be released. Garcia told Rodriguez to return to the mall in an hour and Baker would be there. Garcia and Rodriguez then left the mall. Rodriguez returned to the mall later to wait for Garcia or Baker. After just a few minutes, FBI agents told Rodriguez that Baker was free. Although the record is not clear, it appears that shortly after Garcia's meeting with Rodriguez, either Garcia or someone with Garcia alerted Padilla to the investigation. Padilla responded by releasing Baker and leaving the area. All five defendants were subsequently arrested.

A grand jury indicted the defendants on a number of offenses:

Count 1—conspiracy to kidnap and hold Baker for ransom in violation of 18 U.S.C. § 1201(c) (all defendants);

Count 2—kidnapping/aiding and abetting in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (all defendants);

---

**3.** The Government offered evidence to show that a "throwaway" is the terminology used when referring to a firearm that cannot be traced to the person currently in possession of the firearm.

**4.** It appears that although these calls were automatically forwarded to the Marriott Hotel switchboard, they never reached Rodriguez's room.

Count 3—conspiracy to commit extortion in violation of 18 U.S.C. § 1951 (all defendants);

Count 4—extortion/aiding and abetting in violation of 18 U.S.C. §§ 1951 and 2 (all defendants);

Count 5—interstate travel to promote extortion in violation of 18 U.S.C. § 1952 (Padilla and Hinojosa);

Count 6—transmission of a threat in interstate commerce/aiding and abetting in violation of 18 U.S.C. §§ 875(b) and 2 (Padilla and Hinojosa);

Count 7—carrying or using a firearm during the commission of a crime of violence/aiding and abetting in violation of 18 U.S.C. §§ 924(c) and 2 (Gallegos and Padilla);

Count 8—possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a) (Gallegos);

Count 9—carrying or using a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c) (Rocha);

Count 10—possession of a firearm by a fugitive of justice in violation of 18 U.S.C. §§ 922(g)(2) and 924(a) (Rocha); [5]

Count 11—carrying or using a firearm during the commission of a crime of violence in violation of 18 U.S.C. §§ 924(c) and 2 (Hinojosa and Padilla).

All five defendants entered pleas of not guilty and were tried together before a jury. The verdicts were as follows:

Rocha—guilty on Counts 2, 3, 4 and 9, but not guilty on Count 1;

Padilla—guilty on Counts 1, 2, 3, 4, 5, 7 and 11, but not guilty on Count 6;

Garcia—guilty on Counts 3 and 4, but not guilty on Counts 1 and 2;

Hinojosa—guilty on Counts 1, 2, 3, 4, 5 and 11, but not guilty on Count 6; and

Gallegos—guilty on Counts 1, 2, 3, 4, 7 and 8.

The district court sentenced the defendants under the Sentencing Guidelines. Each defendant now appeals his conviction and sentence on numerous grounds.

## II. DISCUSSION

### A. *Motions for Severance*

■ Federal Rule of Criminal Procedure 14 [6] in limited circumstances affords a district court authority to sever properly joined defendants. The district court's denial of a Rule 14 motion to sever is reviewable only for an abuse of discretion. *United States v. Arzola–Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). To demonstrate an abuse of discretion, a defendant must show that he suffered specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial. *United States v. Harrelson*, 754 F.2d 1153, 1177 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985).

Before and during trial, the defendants moved for severance under Rule 14. The district court denied the motions, and the defendants have appealed on several grounds.

### 1. Proper Joinder

■ Rocha argues that the initial joinder of the five defendants exceeded the limits of Fed.R.Crim.P. 8 [7] and 14 because the indictment alleged only one overt act by him. The general rule is that persons

---

**5.** Count 10 was dismissed on motion of the Government.

**6.** Federal Rule of Criminal Procedure 14 provides, in part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**7.** Federal Rule of Criminal Procedure 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

indicted together should be tried together. *United States v. Kane,* 887 F.2d 568, 571 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990). Because the indictment alleged that each of the defendants participated in the same conspiracy, the requirements of Rule 8 have been satisfied and joinder was proper.

### 2. The Spillover Effect

Padilla's co-defendants contend that the district court should have granted severance to avoid the spillover effect of the evidence which would have been inadmissible against some individual defendants had the defendants not been joined. In general, the defendants' contention is based on two types of evidence: (1) evidence of different aspects of the scheme in which they did not participate and (2) the evidence relating only to Padilla, *i.e.,* his drug transaction with Rodriguez and the arsenal of weapons in his home. Rocha, Garcia, Hinojosa and Gallegos argue that there was such a quantitative and qualitative disparity in the evidence among the co-defendants that each of them suffered compelling prejudice. *See United States v. Harrelson,* 754 F.2d 1153, 1175 (5th Cir.1985). Gallegos also argues that because such a small portion of the evidence at trial was related to him, the jury must have found him guilty by association. Despite their contentions, however, none of the defendants have shown any evidence of specific prejudice.

▮▮▮▮ This Court has stated that when one conspiracy exists, severance is not required, even where the quantum and nature of the proof in each case is different, so long as the trial court repeatedly gives cautionary instructions. *United States v. Lamp,* 779 F.2d 1088, 1093–94 (5th Cir.), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). It is clear that a defendant's absence from a particular episode in the conspiracy does not mandate

severance. *United States v. DeVarona,* 872 F.2d 114, 120 (5th Cir.1989). Similarly, evidence of the reputation or past crimes of one co-defendant, although clearly inadmissible against the other co-defendants, does not ordinarily justify severance. *Harrelson,* 754 F.2d at 1178. Hence, since each defendant here was convicted of essentially one complex conspiracy, severance is not required merely because the Government introduced evidence admissible only against individual co-defendants.

This Court in *United States v. Merida,* 765 F.2d 1205 (5th Cir.1985), rejected arguments similar to those made by defendants here. The defendants in *Merida* attempted to show prejudice by arguing that:

> (1) only a relatively small part of the evidence presented during the eight-week trial related to them directly, (2) the evidence relevant only to the other defendants created a background of egregious conduct against which the jury must have reacted with revulsion, and (3) the jury necessarily found them guilty by association because of the insubstantiality of the evidence against them.

765 F.2d at 1219. The *Merida* Court noted that severance had been denied in other cases in which the trials lasted longer and involved more defendants.[8] In concluding that the defendants' arguments were unpersuasive, the *Merida* Court recognized that

> [t]he test for severance under Rule 14 is whether the jury could sort out the evidence reasonably and view each defendant and the evidence relating to that defendant separately. If cautionary instructions are deemed sufficient, severance is not required.

765 F.2d at 1219.

As in *Merida,* this Court has repeatedly stated that an appropriate limiting instruction is sufficient to prevent the threat of prejudice of evidence which is incriminating

---

**8.** *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983) (seven months and 12 defendants); *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) (six

months and 12 defendants); *United States v. Martino,* 648 F.2d 367 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982) (three months and 20 defendants). In the instant case, the trial lasted eight days and involved five defendants.

against one co-defendant but not another. *See e.g., United States v. DeVarona,* 872 F.2d at 121; *United States v. Jones,* 839 F.2d 1041, 1054 (5th Cir.), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988); *United States v. Massey,* 827 F.2d 995, 1004–05 (5th Cir.1987); *United States v. Hughes,* 817 F.2d 268, 272–73 (5th Cir.), *cert. denied,* 484 U.S. 858, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987).

The evidence was not so complicated as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered. Rocha, Garcia, Hinojosa and Gallegos have suffered no more prejudice "than that which necessarily inheres whenever multiple defendants or multiple charges are jointly tried." *United States v. Tashjian,* 660 F.2d 829, 834 (1st Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981) (quoting *United States v. Adams,* 581 F.2d 193, 198 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978)). The evidence admissible only against Padilla and unrelated to the conspiracy—for example, Padilla's drug transaction with Rodriguez and the arsenal of weapons in his home—clearly did not involve the other defendants, and the prosecutor did not attempt to attribute any responsibility for Padilla's other bad acts to any other defendant. Consequently, there is no reason to believe that the jury would be unable to separate the evidence as it was relevant to each defendant. The district court explicitly instructed the jury— before, during and after the evidence was presented—to consider each offense separately and each defendant individually. This cautionary instruction sufficiently enabled the jury to compartmentalize such evidence and prevent any spillover from tainting another defendant's case. The jury's questions during its deliberations, together with the convictions of the defendants on some counts and the acquittals of some defendants on other counts, demonstrates that the jury was not confused.

█ Rocha and Gallegos further argue, nevertheless, that the court should have severed their prosecution because they were only minimal participants. In *United States v. Erwin,* 793 F.2d 656 (5th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986), this Court ruled that severance was required as to one defendant where the charges against that defendant were only peripherally related to those alleged against her co-defendants; since only a small amount of the "mountainous evidence" was admissible against her, this Court found that severance was required. 793 F.2d at 666. However, severance is required on the basis of a disparity in the evidence only in the most *extreme* cases. *Harrelson,* 754 F.2d 1153, 1175; *United States v. Morrow,* 537 F.2d 120, 136 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). After reviewing the record of the trial, we fail to find that the disparity in the evidence was so extreme that severance was required.

### 3. Padilla's Death Threat

█ On redirect examination of Rodriguez, the Government questioned Rodriguez about a death threat he received from Padilla during trial. Rodriguez testified that, during Rodriguez's direct examination, Padilla mouthed the words, "You are dead," and moved a finger across his throat. Padilla's four co-defendants objected and moved for a severance, alleging that the testimony was highly prejudicial to them. The district court denied the motions but gave a cautionary instruction reminding the jury that the case against each of the defendants must be considered separately and individually.

Rocha, Garcia, Hinojosa and Gallegos contend that the district court erred in denying their motions for severance because the evidence of Padilla's death threat hindered their right to a fair trial. Since Rodriguez's testimony allegedly inflamed the jury and resulted in a spillover effect, the four defendants claim they suffered compelling prejudice.

A death threat of any kind is likely to be inflammatory and triggers concerns about the dangers of prejudice, especially when the death threat occurs during the course of the trial. A district court must be mind-

ful of the negative impact such evidence may have upon the jury and carefully consider the possible unfair prejudice against the other defendants. Nevertheless, a district court's ultimate determination in such a situation is reviewed on appeal only for abuse of discretion. We find no abuse of discretion here.

The facts in *United States v. Jones*, 839 F.2d 1041 (5th Cir.), *cert. denied*, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988) are similar to the facts in the instant case. In *Jones*, the trial court admitted into evidence a recorded telephone conversation in which a co-defendant threatened to murder another co-defendant and a law enforcement officer. Because the trial court gave an appropriate limiting instruction, the *Jones* Court refused to find an abuse of discretion. Even "where evidence is admitted indicating that a codefendant committed a serious crime unrelated to the present charge and the other defendant," the denial of severance is not an abuse of discretion if "it is likely that a properly instructed jury would contain the effect of such evidence and apply it only against the culpable party." 839 F.2d at 1056. Furthermore, a review of decisions in other circuits indicates that a jury instruction is sufficient to remedy any prejudice when a defendant has created a disturbance—in some cases more serious than that which occurred here—during the trial. *See e.g., United States v. Mazza*, 792 F.2d 1210 (1st Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987) (defendant yelled at informant during informant's testimony, "He is lying. I got shot for you, you mother piece of shit. This is my pay back."); *United States v. Tashjian*, 660 F.2d 829 (1st Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981) (defendant gestured with his hands and mouthed words to the effect that a Government witness would receive five bullets in his head and defendant shouted that all defendants were in the Mafia); *United States v. Smith*, 578 F.2d 1227 (8th Cir. 1977) (defendant interrupted proceedings on several occasions by accusing prosecutor and testifying witness of lying and calling the proceeding a "kangaroo court");

*United States v. Chaussee*, 536 F.2d 637 (7th Cir.1976) (defendant attempted to escape in the presence of the jury); *United States v. Bamberger*, 456 F.2d 1119 (3d Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972) (defendant continually interrupted the trial with outbursts and swallowed one of the Government's exhibits); *United States v. Marshall*, 458 F.2d 446 (2d Cir.1972) (defendant shouted obscenities and accusations toward the court, prosecutor and witnesses, hurled a water pitcher at the prosecutor, threw a chair toward the jury rail and cut his wrists with a razor blade).

■ Rocha and Gallegos urge this Court to expand upon language in *United States v. Poteet*, 573 F.2d 351 (5th Cir.1978). In *Poteet*, the defendant complained about a witness' testimony that Poteet had "put a contract out" on the witness. To support their argument that Padilla's threat caused unfair prejudice to them, Rocha and Gallegos seize upon the Court's statements that "the witness' assertion was prejudicial" and that instructing the jury to disregard the testimony "[may] not have been sufficient to cure any unfair prejudice to the defendant." 573 F.2d at 355. Despite Rocha's and Gallegos' argument, however, we decline to extend Poteet to a rule that a mistrial or severance is *automatically* required anytime a defendant's action disrupts the trial. Although deplorable, outbursts or other disruptive actions during the course of the trial by a defendant do not, in and of themselves, justify severance. A rule to the contrary would create an unacceptable result:

> If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so.

*Bamberger*, 456 F.2d at 1128 (quoting *United States v. Aviles*, 274 F.2d 179, 193 (2d Cir.), *cert. denied sub nom. Evola v. United States*, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960)).

The defendants here have not demonstrated that the district court abused its discretion in refusing to grant a severance because of Padilla's death threat. Although we cannot say that no prejudice occurred, two factors limited the prejudicial effect of the death threat. First, the evidence itself was not particularly inflammatory towards Padilla's co-defendants. The threat was made solely by Padilla, and there is no reason for the jury to infer that any other defendant was involved in making the threat. Since the threat occurred during the course of the trial, the jury could not have assumed that the threat was made in the course of or in furtherance of the conspiracy for which the defendants were on trial. Moreover, the prosecutor made no attempt to attribute culpability for the threat to any defendant besides Padilla.

Second, immediately after the Government introduced the evidence of Padilla's threat, the district court carefully instructed the jury that the evidence was to be considered separately against each defendant. Although there may be circumstances in which an instruction is insufficient to overcome the prejudice arising from evidence of an egregious nature that would tend to shock and inflame a jury, we are satisfied that the cautionary instruction here was sufficient to provide adequate protection against compelling prejudice. There is no reason to assume that the district court's instructions were not efficacious. *See United States v. De La Rosa*, 911 F.2d 985, 992 (5th Cir.1990) ("This Court presumes that a jury heeds a trial court's instructions."). The jury's verdict finding defendants guilty of some counts and some defendants not guilty on other counts shows that the jury did not penalize Rocha, Garcia, Hinojosa or Gallegos for Padilla's threat.

#### 4. Antagonistic Defenses

Rocha and Hinojosa contend that they were entitled to separate trials because they asserted defenses which conflicted with Padilla's defense. While Padilla's defense was predicated on a claim of duress, Hinojosa claimed that Baker travelled with them voluntarily, and Rocha claimed he was unaware that Baker was being held involuntarily. Essentially, Rocha and Hinojosa contend that they were not knowledgeable participants of a conspiracy.

■ Co-defendants are entitled to severance when they demonstrate antagonistic defenses. *United States v. Hernandez*, 842 F.2d 82, 86 (5th Cir.1988). The test for antagonistic defenses requires that the defenses be irreconcilable or mutually exclusive: the jury, in order to believe one defendant's defense, must necessarily disbelieve the antagonistic defense of another defendant. *United States v. Perez–Garcia*, 904 F.2d 1534, 1547 (11th Cir.1990); *Hernandez*, 842 F.2d at 86. In other words, the core of one defendant's defense must be contradicted by a co-defendant's defense. *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. Unit B 1981).

■ In the instant case, the defenses of Rocha and Hinojosa do not meet the test. Significantly, although the defense of duress assumes an admission of culpability, Padilla never implicated Rocha or Hinojosa. As this Court recognized in *Kane*,

> [t]he fact that a defendant admits that he is guilty of conspiracy does not necessarily create a conflict between the core of defenses with a co-defendant who maintains that he is not a member of the conspiracies.

*Kane*, 887 F.2d at 572 (citing *United States v. Bruno*, 809 F.2d 1097 (5th Cir.), *cert. denied*, 481 U.S. 1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987)). Thus, the defendants' defenses are not mutually exclusive, as required by the test, since it would be possible for a jury to believe that Padilla was involved in a conspiracy (with Gallegos, Garcia and/or another person), while also believing that neither Rocha nor Hinojosa was a member. *See Bruno*, 809 F.2d at 1103.

#### 5. Exculpatory Testimony

■ Finally, Rocha and Padilla each claims he needed the exculpatory testimony of co-defendants to prove his purported defense. Exculpatory testimony in some cases may provide the basis for a sever-

ance. In order to demonstrate a prima facie case for severance to introduce exculpatory testimony of a co-defendant, a defendant must show: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant would in fact testify if severance were granted. *Kane*, 887 F.2d at 573; *Hernandez*, 842 F.2d at 87. Neither defendant has made a prima facie case for severance. Rocha has failed to establish any of these elements of a prima facie case. Padilla provides an affidavit from Hinojosa which indicates that Padilla was under stress, but Padilla has failed to establish the fourth element, requiring proof that Hinojosa would in fact testify if severance were granted.[9] Padilla asserts that the fact that Hinojosa signed the affidavit was sufficient to create an inference that Hinojosa would testify if severance were granted. However, an inference that a co-defendant would likely testify does not meet the burden of showing that the co-defendant would in fact testify. *Kane*, 887 F.2d at 568. Therefore, the district court did not abuse its discretion in denying the defendants' motions for severance.

### B. Comments on Defendants' Failure to Testify

■■■■■ The Fifth Amendment prohibits a trial judge, a prosecutor or a witness [10] from commenting upon a defendant's failure to testify in a criminal trial. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir.1988); *Davis v. United States*, 357 F.2d 438, 441 (5th Cir.),

*cert. denied*, 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). In determining whether reversal is necessary, this Court must analyze the facts and circumstances of the case. The test for determining if a constitutional violation has occurred is whether "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Davis*, 357 F.2d at 441. A comment regarding a defendant's Fifth Amendment rights must have a clear effect on the jury before reversal is warranted. *United States v. Rochan*, 563 F.2d 1246, 1250 (5th Cir.1977).

The defendants contend that certain remarks during trial amounted to impermissible comments on their failure to testify: (1) Rocha, Hinojosa and Gallegos contend that the district judge improperly emphasized the failure of the defendants to put on a defense by remarking that the defendants' case-in-chief had proceeded quickly, and (2) Garcia contends that the prosecutor and a witness improperly commented on Garcia's silence by suggesting that Garcia would have contacted Rodriguez after Baker's release if Garcia had not been involved in the conspiracy.

#### 1. District Judge's Comment

■■■ The defendants' case-in-chief consisted of one brief character witness on behalf of Hinojosa. Once the defendants rested, the district court stated, "I am somewhat caught by surprise by the rapidity with which the evidence has been presented this morning." [11] After the jury

---

9. Since we find that Padilla clearly fails to establish the fourth element, we need not decide whether the affidavit by itself is sufficient to establish any of the other three elements.

10. The identity of the person making the improper comment is not dispositive of the due process issue; rather, the examination focuses on the effect of the comment upon the jury. *United States v. Shaw*, 701 F.2d 367, 381 n. 8 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984).

11. The district court's statement occurred during the following address to the jury:

> Members of the jury, even though it's only 9:25 by the o'clock [sic] on the wall and I had told you yesterday afternoon that we would be having our usual morning session today, that is until eleven o'clock, I am somewhat caught by surprise by the rapidity with which the evidence has been presented this morning. As I understand the situation, all parties have now presented all the evidence they wish us to consider in this case, and I have some work to do on the instructions to you on the law which I also put into writing because I think they are easier to understand and to follow if they are written down.

was excused, the defendants objected to the court's comment but the district court overruled the objections.[12] Rocha, Hinojosa and Gallegos contend that the district court's comment constituted a comment on the defendants' failure to testify or present any evidence at the trial.

After reviewing the facts and circumstances of the case, we find that reversal is not required. The defendants do not contend that the district judge had the requisite manifest intention of commenting on the silence of the defendants. Furthermore, the jury would not "naturally and necessarily" take the district judge's remark as a comment on the failure of the defendants to testify. The comment was made during the course of the district judge's attempt to explain to the jury the reason the session was ending early. It is reasonable to interpret the remark as merely a comment on the progress of the trial rather than a comment on the defendants' Fifth Amendment privilege not to testify.[13] *See, e.g., United States v. Haynes,* 573 F.2d 236, 238 (5th Cir.1978) (refusing to reverse where trial judge stated that defense counsel could overcome some evidentiary problems by putting the defendant on the stand); *United States v. Rochan,* 563 F.2d 1246, 1250 (5th Cir.1977) (refusing to reverse where trial judge stated that "the only thing we have heard from the defense was this one witness").

### 2. Prosecution Witness' Comments

■ During the Government's direct examination of Rodriguez, the prosecutor asked Rodriguez about the events following Baker's release. The following colloquy ensued:

Q: Did you at the request of FBI agents attempt to call Hector Garcia–Garcia a few days later?

A: Yes.

Q: What did you say?

A: I called his business up and told him to get a hold of me because I had told the FBI that I didn't think Hector was involved in it and that he would get a hold of me. One of the agents said if he's not involved, he'll get a hold of you.

Garcia objected and moved for a mistrial. The court, while overruling the motion for mistrial, sustained the objection and instructed the jury to disregard Rodriguez's last answer. On appeal, Garcia argues that the prosecutor's question and Rodriguez's response together were equivalent to a comment on Garcia's silence and his failure to testify, resulting in a denial of due process.

There is no evidence that Rodriguez's response was manifestly intended as a comment on the failure of Garcia to testify. Indeed, at the bench conference immediately after Rodriguez's statement, the prosecutor claimed that she "had no idea" that Rodriguez would respond in that manner. Garcia does not dispute the prosecutor's lack of intent. At the same time, a fair reading of the exchange does not support a finding that the jury "naturally and necessarily" interpreted the remarks as a comment on Garcia's failure to testify. Rodriguez's answer merely indicates that Rodriguez attempted to contact Garcia several days after the events occurred. The question of whether or not Garcia contacted Rodriguez at a later time remained unanswered. Thus, there is no reason to believe that the jury inferred from this testimony

---

**12.** Although Gallegos requested a curative instruction, Padilla and Hinojosa protested on the ground that an instruction might draw the jury's attention to the comment. Because the defendants' counsel could not agree as to what type of instruction should be given, the district court declined to give any instruction.

**13.** We also note that any possible effect on the jury was limited by the instructions given by the district judge before and after the disputed remark. Just the day before, the district judge

reminded the jury that all the defendants were "presumed innocent and have no obligation whatever to prove their engines [sic] or to put on any evidence at all." Additionally, at the end of trial, the judge instructed the jury about the burden of proof and the presumption of innocence, including a reminder that "[t]he law does not require any defendant to prove his innocence or to produce any evidence at all, and no inference whatever may be drawn from the election of any defendant not to testify."

**234**

anything about Garcia's privilege not to testify.[14]

## C. Prosecutorial Misconduct

During the Government's rebuttal closing argument, the prosecutor stated that Rocha's and Gallegos' purpose in the basement of the Marriott Hotel was "to make a hit on Mr. Rodriguez" and that Rocha and Gallegos "were supposed to kill [Rodriguez] before [Rodriguez] ever left the hotel."[15] The district court refused to grant a mistrial but sustained the defendants' objections and instructed the jury to disregard the statements. The defendants contend that the prosecutor's remarks amounted to an allegation of intent to commit murder and effectively denied them a fair trial.[16] The prosecutor's highly inflammatory accusation of uncharged conduct, the defendants claim, was without any evidentiary basis and mandates a reversal of their convictions.

The prosecutor's role in criminal prosecutions is subject to careful scrutiny. As a representative of the Government, the prosecutor has a power of influence over the jury that he might not otherwise have. For this reason, the obligation of fair play by the prosecutor is accentuated. *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir.1989).

The prosecutor should and must perform his duties vigorously, and may, at times,

do so even zealously; what he must not do is permit his ambitious desire to obtain a conviction to impinge upon the integrity he must maintain as a representative of the United States.

*United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir.1988), *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989).

Nevertheless, the district court is in the best position to decide whether it is necessary to grant a mistrial on the basis of alleged prosecutorial misconduct. Absent an abuse of discretion, the district court's ruling will not be set aside on appeal. *United States v. Cardenas*, 778 F.2d 1127, 1130 (5th Cir.1985). This Court has recognized that "[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Lowenberg*, 853 F.2d at 302. Thus, the test for determining whether a conviction should be overturned is whether the prosecutor's remarks were *both* inappropriate *and* harmful. *United States v. Young*, 470 U.S. 1, 9–11, 105 S.Ct. 1038, 1043–44, 84 L.Ed.2d 1 (1985). A defendant is entitled to reversal only if he shows that the prosecutor's statements affected his substantial rights by casting serious doubt on the jury's verdict. *Lowenberg*, 853 F.2d at 302. In determining whether improper arguments affect a defendant's substantial

---

**14.** We note that the facts do not present a constitutional violation under *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), in which a prosecutor's comment on a defendant's silence following arrest under *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624 n. 37, 16 L.Ed.2d 694 (1966), could amount to reversible error. Rodriguez's attempts to contact Garcia occurred at a time prior to Garcia's arrest.

**15.** The questionable comments were made in the following discourse during the Government's rebuttal closing arguments:

[Gallegos'] reason for being at the Marriott, this man who Michael Baker knew as Rambo, I submit to you that Mr. Gallegos was at the Marriott to aid Mr. Rocha in causing an ambush on Tony Rodriguez. Their purpose for being there and their purpose for calling the hotel switchboard four or five times there within a few minutes is they are trying to

determine what room number Mr. Rodriguez was in, and they are going to make a hit on Mr. Rodriguez. Either go up to the room and do it or catch him as he is on his way out to the mall, and when Hector Garcia saw Tony Rodriguez alive at the Forum 303 mall he was probably more surprised than anyone else because I submit to you that Mr. Rocha and Mr. Gallegos were supposed to kill him before *he ever left the hotel and get his money.*

**16.** The defendants assert several different arguments. Rocha and Gallegos argue that they suffered prejudice because the prosecutor's statements amounted to an allegation of uncharged misconduct against them. Padilla and Hinojosa argue that they suffered prejudice because the prosecutor's inflammatory statements prejudiced the minds of the jury against all the defendants. Garcia simply argues that he suffered prejudice because the prosecutor's statements were inflammatory and the evidence against him was weak.

rights, this Court should consider the following: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt. *Id.*

The Government argues that the prosecutor's statements in rebuttal closing argument were a direct response to Gallegos' closing argument in which Gallegos' counsel suggested that it was unreasonable to conclude that Gallegos and Rocha went to the Marriott to "bump [Rodriguez] off." In short, Gallegos' counsel, not the prosecutor, opened up the subject of Gallegos' and Rocha's intent to kill Rodriguez. Nevertheless, Rocha and Gallegos contend that the remark of Gallegos' counsel was itself a response to the prosecutor's comment in the Government's initial closing argument. During the initial closing argument, the prosecutor stated that Padilla "sent his people to the Marriott Hotel to collect that debt [for the cocaine] in person. And whether that debt would be the physical person of Tony Rodriguez or the money, it does not appear as if it mattered." Although we are not convinced that this comment amounted to an accusation of conspiracy to murder, none of the defendants objected and Gallegos' counsel clearly used an "intent to murder argument" in his closing argument. Thus, it is difficult to find merit in the defendants' contention that the prosecutor's remarks in rebuttal closing argument were inappropriate under the circumstances; they were responsive to Gallegos' closing argument, and there were no objections to the prosecutor's comment in the initial closing argument which Gallegos contends opened up the issue of intent to murder. We need not decide the propriety of the prosecutor's comments, however, because even if we assume the prosecutor's statements were inappropriate, the ultimate question is whether the statements amounted to harmful error. *Murrah*, 888 F.2d at 27.

▌ In light of the context of the arguments and the entirety of the trial, any prejudicial impact on the defendants was minimal. The prosecutor's remarks in rebuttal closing arguments were only a small portion of the entire closing arguments and the prosecutor phrased her remarks in such a manner that they amounted to a suggested inference from the evidence rather than an argument outside the record. As soon as the remarks were made, the district court immediately instructed the jury to disregard the prosecutor's statements, effectively eliminating any prejudicial effect the statements might have had on the defendants. *See Cardenas*, 778 F.2d at 1132. In addition, during the jury instructions following the closing arguments, the district court emphasized to the jury that statements of counsel were not evidence and the defendants were being tried only for the offenses charged.[17]

Furthermore, after reviewing the entirety of the evidence, consisting of witness' testimony, fingerprint identifications, hotel and rental car records, telephone company records, recorded telephone conversations, photographs and other physical items of evidence, we find there was sufficient evidence to convict each defendant.[18]

The following evidence connected Rocha

---

**17.** The district court instructed the jury as follows:

Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.... I caution you that you are here to decide whether the government has proved beyond a reasonable doubt that each defendant is guilty of the crimes with which he is charged. The defendants are not on trial for any act, conduct, or offense not alleged in the indictment.

**18.** The evidence against Padilla and Hinojosa was so overwhelming that we need not elucidate the myriad of evidence proffered by the Government against them. On the other hand, the evidence against Rocha, Garcia and Gallegos consisted largely of circumstantial evidence and it is therefore appropriate to review the evidence against them.

and Gallegos to the conspiracy:[19] (1) Rocha joined Padilla and Baker as soon as Padilla arrived with Baker in Dallas, Texas; (2) Rocha rented the motel room where Baker was confined; (3) Baker observed a bulge inside Rocha's waistband which Baker believed was a gun; (4) during Padilla's absence for a couple of hours, Rocha was alone with Baker; (5) while with Rocha, Baker felt he was not free to leave and was too frightened of Rocha to try to escape; (6) Gallegos was present in the motel room where Baker was confined; (7) Gallegos drove Padilla and Baker to make one of the ransom calls to Baker's mother; (8) Padilla directed Rocha, Hinojosa and Gallegos to find Rodriguez; (9) Baker observed Hinojosa conceal a handgun and get into a brown Lincoln Continental in which Rocha and Gallegos were already seated; (10) FBI agents observed Rocha and Gallegos talking on the Marriott Hotel basement telephone at approximately the same time as telephone calls to the FBI hello phone were traced; (11) Rocha nodded in the direction of Rodriguez when Rodriguez passed by Rocha; (12) once Rocha and Gallegos appeared to notice that they were being watched by undercover agents, Rocha and Gallegos quickly left the area and entered a brown Lincoln Continental; (13) after Rocha and Gallegos were arrested, agents discovered beneath Gallegos' seat a loaded nine millimeter semiautomatic pistol with Gallegos' fingerprints on the clip and discovered beneath Rocha's seat a loaded .38 caliber revolver; and (14) a search of Rocha after his arrest revealed four .38 caliber bullets appropriate for use in the .38 caliber revolver found beneath Rocha's seat, a matchbook cover with the telephone number of Baker's mother, and a piece of paper with several notations (the number of the FBI hello phone, the alias that Padilla used when referring to Rodriguez, and the partial Marriott Hotel room number that Rodriguez had initially given to Padilla).

The following evidence connected Garcia to the conspiracy: (1) Garcia introduced Rodriguez to Padilla; (2) Padilla told Rodriguez at least two times that Garcia would telephone Rodriguez to set up a meeting so that Padilla would get his money; (3) Garcia telephoned Rodriguez using the FBI hello phone number which had only been given to Padilla; (4) Garcia stated that Padilla had contacted him and instructed Rodriguez to meet him at the Forum 303 Mall with the money for Padilla; (5) when Rodriguez arrived at the Forum 303 Mall to meet Garcia, he observed Garcia using a telephone located near the mall theaters; (6) telephone records indicate that minutes before Rodriguez arrived at the mall, two collect calls were made to the Hinojosa residence from the telephone located near the mall theaters; (7) after assuring himself that Rodriguez was not wired with a microphone, Garcia stated that he would tell Padilla that Rodriguez had the money and he guaranteed that Padilla would release Baker; (8) Garcia told Rodriguez to return to the mall in an hour and Baker would be there; (9) Garcia walked Rodriguez to the exit and then turned around to walk in the opposite direction; (10) during the meeting between Garcia and Rodriguez, agents observed an unidentified man watching the meeting and the surrounding area; and (11) after Garcia left Rodriguez, Garcia and the other man slowly walked through the mall toward a different exit, stopping frequently to look around them.

Considering the limiting instructions given and the strength of the evidence against the defendants, we find that the prosecutor's remarks did not infringe upon the substantial rights of any defendant. Hence, the district court did not abuse its discretion in refusing to grant a mistrial because of the prosecutor's comments.

## D. *Sufficiency of the Evidence*

▮ Count 9 of the Indictment charged Rocha with carrying or using a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c). Rocha contends that there was no evidence to support his conviction for that offense. In

---

**19.** Since the evidence against Rocha and Gallegos is largely interconnected, we will consider the evidence against them together.

reviewing Rocha's firearms conviction, this Court "must examine all the evidence and reasonable inferences in the light most favorable to the government and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Fortna*, 796 F.2d 724, 740 (5th Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). Even where the Government's case is largely circumstantial, the scope of review of the evidence is the same. *Shaw*, 701 F.2d at 394.

■ The purpose of section 924(c) "is to impose more severe sanctions in those instances in which firearms facilitate, or have the potential of facilitating, the commission of certain serious crimes." *United States v. Coburn*, 876 F.2d 372, 375 (5th Cir.1989). Consequently, this Court has stated that the Government need not prove that the defendant used, handled or brandished the firearm in an affirmative manner. *United States v. Molinar–Apodaca*, 889 F.2d 1417, 1424 (5th Cir.1989). Proof of possession of a firearm is sufficient if the possession is "an integral part of the felony." *United States v. Robinson*, 857 F.2d 1006, 1010 (5th Cir.1988). Contrary to Rocha's contention, ownership is not essential to possession. *Id.* The Government here need only show that the firearm was available to Rocha to facilitate the commission of an offense of violence. *See Molinar–Apodaca*, 889 F.2d at 1424.

The Fifth Circuit and other circuit courts have found the requisite "use" in a variety of circumstances. *See, e.g., Molinar–Apodaca*, 889 F.2d at 1424 (firearms and ammunition found in defendant's residence); *United States v. McKinnell*, 888 F.2d 669, 674 (10th Cir.1989) (firearm found under bag on the passenger seat next to defendant); *Coburn*, 876 F.2d at 375 (unloaded shotgun displayed in rear window of pickup truck); *United States v. Meggett*, 875 F.2d 24, 29 (2d Cir.1989) (firearms secreted about defendant's residence); *Robinson*, 857 F.2d at 1010 (firearms and ammunition found in defendant's residence); *United States v. Stewart*, 779 F.2d 538, 539 (9th Cir.1985) (firearm found in trunk of car while defendant in front of house), *cert. denied*, 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). Moreover, this Circuit has found a violation of 18 U.S.C. § 924(c) in circumstances similar to the instant case. In *United States v. Munoz–Fabela*, 896 F.2d 908, 911 (5th Cir.1990), law enforcement officers found a loaded gun on the floorboard of the vehicle in which the defendant was seated. This Court found there was sufficient evidence to find "use" even though the defendant did not own the gun, his fingerprints were not found on it and he denied knowledge of the gun's location. *Id.*

■ Baker testified that when he was alone in the motel room with Rocha, he observed a bulge in Rocha's waistband and believed that the bulge was a gun. Later, Rocha was seated in the brown Lincoln Continental when Hinojosa got into the vehicle with a gun. When Rocha was arrested in the Lincoln Continental at the Marriott Hotel, a loaded .38 caliber revolver was found beneath Rocha's car seat. An FBI agent testified that the position of the gun was consistent with a person gripping the gun in his right hand and placing it under his seat. In his right front pants pocket, Rocha carried four .38 caliber bullets. In addition, for some time prior to and at the time of the arrest, Rocha was with Gallegos, who also possessed a firearm. Further, Baker's testimony that Padilla sent Rocha and Gallegos to apprehend Rodriguez, which was corroborated by the telephone calls to the hello phone traced to the telephone Rocha was seen using and the items found on Rocha's person, demonstrates that Rocha's purpose at the Marriott Hotel was in furtherance of the conspiracy. Thus, the jury reasonably could have concluded that the firearm found beneath Rocha's seat was readily accessible to him and formed an integral part of his criminal undertaking by providing a means of intimidating Rodriguez or others encountered in the course of the conspiracy. This Court finds that sufficient evidence existed to support Rocha's conviction for carrying or using a firearm in the commission of a crime of violence.

■ Rocha next argues that the district court improperly commented on the weight of the evidence in instructing the jury that possession of a firearm by itself may constitute the requisite use under 18 U.S.C. § 924(c). The jury submitted a question requesting the legal definition of "possession." The district court responded with a supplemental instruction defining possession in terms of both actual possession and constructive possession. The supplemental instruction was merely a definition of possession; it did not suggest that possession was sufficient to constitute use under section 924(c) nor did it purport to make any connection whatsoever to section 924(c). Therefore, there is no reason to find that the district court improperly commented on the weight of the evidence.

### E. *Admissibility of the Evidence*

Rocha and Padilla individually assert different grounds of error regarding the district court's evidentiary rulings.

*Rocha:*

#### 1. Search Incident to Arrest

■ Rocha asserts that any evidence the Government seized from him was inadmissible because there was no probable cause for his warrantless arrest. Probable cause "exists when the facts and circumstances within the knowledge of the arresting officer are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Antone,* 753 F.2d 1301, 1304 (5th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The arresting officer need not have personal knowledge of all the facts constituting probable cause but can rely upon the collective knowledge of the police when there is communication among them. *United States v. Webster,* 750 F.2d 307, 323 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). The evidence necessary to establish probable cause is far less than that required for a conviction. *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 108 (1988).

■ In the instant case, there was probable cause to arrest Rocha. During the taped telephone conversations between Padilla and Rodriguez, Padilla was intensely interested in obtaining Rodriguez's room number, leading to a reasonable conclusion that Padilla would send someone to find Rodriguez. Before Rocha's arrest, FBI agents observed Rocha on the Marriott basement telephone at approximately the same time as calls to the FBI's hello phone were traced to the basement telephone. The agents reasonably suspected there was a link between Padilla and Rocha. Rocha's frequent glances and his swift departure once Rocha noticed the agents observing him and Gallegos corroborated the agents' suspicion that Rocha was a participant in the scheme. These facts, viewed in the totality of the circumstances, established probable cause. *See United States v. Cisneros–Mireles,* 739 F.2d 1000, 1002–03 (5th Cir.1984). Because the agents had probable cause to arrest Rocha, the warrantless search of his person incident to the arrest was not invalid; the items seized therefore were admissible into evidence. *See New York v. Belton,* 453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

#### 2. Evidence of Theft of Gun

■ During trial, the Government offered a witness who testified that he owned a .38 caliber handgun which was stolen from his home during a burglary. While there were no allegations that there was any connection between the burglary and the defendants, the witness verified that the handgun seized from the Lincoln Continental beneath Rocha's seat was the same weapon stolen from his home. The Government explained that the testimony was relevant to show that the weapon seized from the Lincoln Continental was a "throwaway," *i.e.,* a gun that could not be traced to the defendant, thereby connecting Rocha to Padilla and Hinojosa as co-conspirators. Rocha argues that the testimony was inadmissible because such evidence was irrelevant and prejudicial.

Federal Rule of Evidence 402 provides that evidence which is not relevant is not admissible. Relevant evidence is defined

as "evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R. Evid. 401. Even if the evidence is relevant, however, the court may exclude it if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R. Evid. 403. The district court's ruling on the admissibility of evidence is subject to considerable deference. *United States v. Hays*, 872 F.2d 582, 587 (5th Cir.1989).

Baker testified that after Padilla ordered Hinojosa to get the "throwaway," Hinojosa returned with a large handgun. Later, Rocha was arrested and found in possession of a gun. The challenged testimony established that the gun found in Rocha's possession had been stolen in a burglary; in the possession of anyone other than the owner, the gun fit the definition of a "throwaway." The evidence about the throwaway related to the specific offenses charged since it tended to link Rocha with Hinojosa and Padilla. Therefore, the testimony was relevant.

Having decided that the testimony concerning the throwaway was relevant, we turn to the issue of prejudice. It is not enough simply to show that the evidence is prejudicial as virtually all evidence is prejudicial or it is not material. To warrant reversal, the prejudice must be unfair. *Dollar v. Long Mfg., N.C. Inc.*, 561 F.2d 613, 618 (5th Cir.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The district court explicitly determined that the probative value of the testimony was not substantially outweighed by prejudice since the Government was not trying to accuse any defendant of stealing the gun but offered the testimony to explain evidence already admitted concerning the "throwaway." This Court declines to find that the district court abused its discretion.

### 3. Photographs

The Government introduced photographs of guns, ammunition and drug scales taken during the search of Padilla's home. The district court summarily overruled Rocha's objections to such evidence. We are unable to conclude that this action was erroneous because Rocha has not shown how he was harmed.[20] The Government never made any connection between Rocha and the items discovered in Padilla's house, nor can we find any reason that the jury would make such an inference. While the district court did not give a limiting instruction at the time, defense counsel failed to request any instruction. Nevertheless, we note that the district court clearly directed the jury several times during the trial to give separate consideration to the evidence as it pertains to each defendant. Thus, this Court can find no clear abuse of discretion in admitting the photographs into evidence.

### 4. Statements of Co-conspirators

The district court admitted into evidence the out of court statements made by Rocha's co-defendants. Rocha argues that this action was erroneous because the Government offered no proof of a conspiracy and the jury acquitted Rocha of conspiracy to kidnap.

Federal Rule of Evidence 801(d)(2)(E) provides that statements by co-conspirators during the course and in furtherance of the conspiracy are not hearsay. The district court need not make a determination, prior to the introduction of the statement, whether the proposed statement complies with Rule 801(d)(2)(E). Instead, the court may, as the district court did here, allow the introduction of the challenged statement, subject to the prosecutor's subsequent establishment of an adequate foundation. *United States v. Kimble*, 719 F.2d 1253, 1257 (5th Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Once the Government rested its case, the district court determined that the Government had adequately demonstrated a conspiracy and, therefore, the co-conspirator statements were admissible. While Rocha was acquitted of conspir-

---

20. We do not decide here whether the photographs were admissible against Padilla.

acy to kidnap, he was convicted of conspiracy to extort. The phrase "in furtherance of the conspiracy" is to be given a literal interpretation. *United States v. Ascarrunz*, 838 F.2d 759, 763 (5th Cir.1988). Thus, any statements of his co-defendants relating to Baker or any demands made in exchange for Baker's safety were made in furtherance of a conspiracy in which Rocha was a participant. This includes statements which occurred before Rocha joined the conspiracy since there was evidence of Rocha's subsequent knowledge and willingness to participate in the conspiracy. *United States v. Osgood*, 794 F.2d 1087, 1093 (5th Cir.), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986).

### 5. Summary Testimony

■ Rocha here complains that the district court erroneously permitted Agent Paul Shannon to summarize the testimony of others. Rocha, however, does not specify what matters are objectionable.[21] Upon reviewing Agent Shannon's testimony, we are unable to find an abuse of discretion. The district court occupies the best position to gauge the admissibility of evidence; its decisions on admissibility are subject to considerable deference. The transcript indicates that throughout Agent Shannon's testimony, the district court carefully considered objections from defense counsel. Before admitting an exhibit into evidence, the district court properly required the prosecution to establish its relevance. One of the Government's exhibits, a chronological list of telephone calls, clearly was summary testimony. However, the district court did not abuse its discretion in allowing this testimony as the district court admitted the exhibit only for demonstrative purposes and gave an appropriate limiting instruction.[22]

### *Padilla:*

### 6. Padilla's Death Threat

Padilla contends that the district court erroneously admitted evidence regarding Padilla's death threat during Rodriguez's direct examination.[23] Padilla claims that this testimony amounted to evidence of uncharged misconduct in violation of Fed.R. Evid. 404(b)[24] and 403.[25]

In *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), this Circuit enunciated a two-step analysis, encompassing the substance of both Rule 404(b) and Rule 403, for determining the admissibility of extrinsic evidence:

**21.** In his appellate brief, Rocha's only example of the type of summary evidence given by Agent Shannon involved the FBI's hello number. During the trial, however, Rocha's counsel expressly withheld any objection to that testimony.

**22.** The district court gave the following limiting instruction:

Ladies and gentlemen, I have ruled that you may see this document, Government's Exhibit D-2 at this time to help you understand, if it does, the testimony of Mr. Shannon; however, as I understand the document, it purports to summarize other evidence which is in the record and which you will be able to consider when you begin your deliberations.... If you discover any differences or discrepancies between this chart, Government's Exhibit D-2 and the underlying evidence that it purports to summarize, then you should disregard what is on this chart to the extent of any such differences or discrepancies.

In other words, this chart is being admitted only for the limited purpose of assisting you,

if it does, in understanding the other evidence.

**23.** On appeal, Padilla also argues that such evidence of his in court conduct severely prejudiced his Fifth Amendment right against self-incrimination. We find no constitutional error.

**24.** Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**25.** Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.[26]

Although the record does not reflect the Government's basis for introducing the death threat evidence, it appears that Padilla's actions during Rodriguez's direct examination were admissible to show Padilla's consciousness of guilt. *See United States v. Rosa,* 705 F.2d 1375, 1377 (1st Cir.1983). Evidence of a threat by a defendant respecting a specific adverse witness indicates that the defendant was conscious of the weakness of his case; such evidence creates a compelling inference that the defendant's case lacks merit. *United States v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987). The testimony here was probative of Padilla's guilt in the offenses charged and of the validity of his defense of duress. Because the evidence of Padilla's threat is probative of an issue other than his character, it is admissible under Rule 404(b).

The next question in the *Beechum* analysis is whether the probative value of the testimony is substantially outweighed by the danger of unfair prejudice. In reviewing the balancing undertaken by the district court, we give great deference to the court's informed judgment and will reverse only after a clear showing of prejudicial abuse of discretion. *United States v. Shaw,* 701 F.2d 367, 386 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419,

79 L.Ed.2d 744 (1984). Rodriguez's testimony concerning Padilla's threat arguably created unfair prejudice to Padilla, but it did not create *substantial* unfair prejudice. *See United States v. Hammond,* 781 F.2d 1536, 1540 (11th Cir.1986) (evidence of attempts to influence a witness admissible under Rule 403). The evidence was not a critical part of the Government's case against Padilla and the Government did not place undue emphasis on it. Moreover, Padilla's threat could be viewed as an emotional and impulsive action since it was made during Rodriguez's testimony when Rodriguez was implicating Padilla. Any unfair prejudice was mitigated under the circumstances; Padilla was clearly not in a position to carry out his threat at that time nor in the immediate future. In determining that there was not substantial unfair prejudice, we do not overlook the fact that Padilla's threat occurred in open court and in full view of the jury, although it is not entirely clear whether any of the jurors actually observed the conduct. Inasmuch as Padilla's argument is based on the danger that the jury might render a decision on an improper basis, the argument seems counterintuitive in light of Padilla's determination to threaten Rodriguez in the jury's presence. Under the circumstances present here, it was reasonable for the district court to conclude that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.[27]

### 7. Cross Examination of Rodriguez

Padilla next challenges the refusal of the district court to allow him to cross-examine Rodriguez about filing income tax returns.[28] Padilla claims that the informa-

---

**26.** While the district court here made no *Beechum* analysis on the record, we note that Padilla's trial objection was a general assertion of prejudice and he failed to mention Rule 404(b).

**27.** We are unable to find plain error in the district court's failure to give a jury instruction on the appropriate use of the evidence by the jury under Rule 404(b) since Padilla's objection was not based on Rule 404(b) and Padilla did not request such an instruction.

**28.** The relevant portion of the cross-examination of Rodriguez by Padilla's counsel was as follows:
Q: Have you been filing your income tax returns over the years?
A: I—
PROSECUTOR: I object to the form of the question. It's improper impeachment.
Q: Well, did you file your income tax return for 1988?
PROSECUTOR: Once again I object to the form of the question. I object to the subject matter.

tion he sought to obtain from Rodriguez would have affected Rodriguez's credibility by showing that Rodriguez was a tax evader. The improper limitation of cross examination of Rodriguez, Padilla contends, violated his constitutional right of confrontation and was an abuse of the district court's discretion.

 The confrontation clause of the Constitution mandates that a defendant must be permitted to cross-examine a witness to determine if the witness has any biases, prejudices or ulterior motives that may provide an incentive on the part of the witness to falsify his testimony. *Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). However, Padilla does not contend that Rodriguez possessed any bias or motive to falsify his testimony. Rather, Padilla contends simply that the evidence would affect Rodriguez's credibility. The confrontation clause does not require the admission of "all character evidence of whatever relevance and probative value." *Cloud v. Thomas,* 627 F.2d 742, 744 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981). Aside from the limited inference that a tax evader has a propensity to lie, the evidence Padilla sought to offer had no relevance to the issue of truthfulness. Thus, the refusal to admit evidence of such limited value did not violate the confrontation clause. *Id.* at 745.

 Nor do we find that the district court abused its discretion in limiting Padilla's cross-examination of Rodriguez on the tax evasion issue. The district court has broad discretion in restricting the scope of cross-examination. *United States v. Andrew,* 666 F.2d 915, 925 (5th Cir.1982). On appeal, the district court's ruling is reviewed under an abuse of discretion standard. *United States v. Bright,* 630 F.2d 804, 817 (5th Cir.1980). The district court here permitted extensive cross-examination of Rodriguez concerning Rodriguez's prior

employment and the cocaine transaction with Padilla. Any possible relevance that Rodriguez's compliance with income tax directives may have had was minimal at best under the circumstances. Padilla's need to impeach Rodriguez's credibility was limited by Padilla's defense of duress which did not require the jury to disbelieve Rodriguez in order to believe Padilla was acting under duress.

## D. *Sentencing Guidelines*

 Errors of law in applying the Sentencing Guidelines are fully reviewable on appeal. *United States v. Otero,* 868 F.2d 1412, 1414 (5th Cir.1989). On the other hand, findings of fact are entitled to considerable deference under the clearly erroneous standard of review. *United States v. Barbontin,* 907 F.2d 1494, 1497 (5th Cir. 1990). Both jointly and individually, the defendants allege a number of errors in their sentences.

### 1. Demand for Ransom

Rocha, Padilla, Hinojosa and Gallegos contend that the district court erred in enhancing their base offense levels six levels under section 2A4.1(b)(1) for committing the offense of kidnapping when a ransom demand was made, and four levels under section 2A4.1(b)(5) for committing the offense of kidnapping when the victim was kidnapped to facilitate the commission of another offense (extortion). The three defendants argue that enhancing the offense level once for the ransom demand and again for extortion amounted to a double penalty for the same conduct. In support of their argument, the defendants point to the commentary to section 2A4.1 which states that "[a]n enhancement is provided when the offense is committed for ransom *or* to facilitate the commission of another offense." Sentencing Guidelines § 2A4.1, commentary (emphasis added). The defendants urge that the conjunction *or* implies

It's improper impeachment, outside the scope of direct.
PADILLA'S DEFENSE COUNSEL: It's cross examination. I'm getting into his finances. He testified that he was involved in a large cocaine

deal, that he did make some money off the cocaine, and I want to find out whether or not he included any taxable income on his tax returns for these drug deals he's been in.
THE COURT: I'll sustain the objection.

that their sentences may be enhanced for a ransom demand or to facilitate the commission of the offense of extortion, but not both. This issue is one of first impression.

■■■■ The Sentencing Guidelines are subject to the rules of statutory construction. *United States v. Vickers*, 891 F.2d 86, 88 (5th Cir.1989). "Accordingly, this Court follows the clear, unambiguous language of the Guidelines if there is no discernible manifestation of contrary intent." *Id.* Section 2A4.1 itself is unambiguous. It specifies five categories of specific offense characteristics for which a defendant's base offense may be enhanced.[29] Each of the categories provides for a separate increase in the base offense level. The section does not specify that the categories are mutually exclusive, nor do we infer any contrary intent by the Sentencing Commission that the section mandates the use of only one category to enhance a defendant's offense level. Significantly, the commentary to section 1B1.1 entitled "Application Instructions" states:

The offense level adjustments from more than one specific offense characteristic within an offense guideline are cumulative (added together) unless the guideline specifies that only the greater (or greatest) is to be used.[30]

Contrary to defendants' argument that the commentary to section 2A4.1 implies that the district court cannot double count for a ransom demand and for the offense of extortion, the Sentencing Guidelines are explicit when double counting is forbidden. For example, the commentary to sections 3A1.1,[31] 3A1.2,[32] 3A1.3 [33] and 3C1.1 [34] clearly provide that an offense level increase based on specific conduct is not permitted if the offense guideline already takes into account that same conduct. The language of the commentary to section 2A4.1 quoted by the defendants here, however, is substantially different in form and content from the clear enunciations in those other sections. Under the principle of statutory construction *expressio unius est exclusio alterius*,[35] the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded. *Vickers*, 891 F.2d at 88. While the Guidelines specify certain exceptions in other

29. Section 2A4.1(b) provides the following specific offense characteristics:
(1) If a ransom demand or a demand upon government was made, increase by 6 levels.
(2)(A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels.
(3) If a dangerous weapon was used, increase by 2 levels.
(4)(A) If the victim was not released before thirty days had elapsed, increase by 2 levels. (B) If the victim was not released before seven days had elapsed, increase by 1 level. (C) If the victim was released before twenty-four hours had elapsed, decrease by 1 level.
(5) If the victim was kidnapped, abducted, or unlawfully restrained to facilitate the commission of another offense:
(A) increase by 4 levels; or (B) if the result of applying this guideline is less than that resulting from application of the guideline for such other offense, apply the guideline for such other offense.

30. The commentary to § 1B1.1 continues:
Within each specific offense characteristic subsection, however, the offense level adjustments are alternative; only the one that best describes the conduct is to be used. *E.g.*, in § 2A2.2(b)(3), pertaining to degree of bodily injury, the subdivision that best describes the level of bodily injury is used; the adjustments for different degrees of bodily injury (subdivisions (A)–(E)) are not added together.

31. Application Note 2 to section 3A1.1 states, "Do not apply this adjustment if the offense guideline specifically incorporates this factor."

32. Application Note 3 to section 3A1.2 states, "Do not apply this adjustment if the offense guideline specifically incorporates this factor."

33. Application Note 2 to section 3A1.3 states, "This adjustment applies to any offense in which a victim was physically restrained in the course of the offense, except where such restraint is an element of the offense, specifically incorporated into the base offense level, or listed as a specific offense characteristic."

34. Application Note 4 to section 3C1.1 specifies the types of offenses for which the adjustment shall not apply, apparently because of the similarity in the type of conduct considered in each.

35. The expression of one thing is the exclusion of another. Black's Law Dictionary 521 (5th ed. 1979).

sections to the application of an enhancement to a particular characteristic that has already been taken into consideration elsewhere, there are no exceptions in section 2A4.1 to the enhancement of a defendant's base offense level for a ransom demand when the defendant's base offense level is enhanced for the facilitation of extortion, even if both specific offense characteristics involve the same conduct. We must presume therefore that the Sentencing Commission intended that a defendant's base offense level could be enhanced under section 2A4.1 both for a ransom demand and again for the offense of extortion.[36] Moreover, this Court has ruled that a court may enhance a defendant's sentence under more than one guideline section or subsection even though the two enhancements are for essentially the same conduct. *See Vickers*, 891 F.2d at 88 (rejecting defendant's argument that his sentence was improperly enhanced twice under sections 4A1.1(d) and (e) for essentially the same criminal conduct). The district court did not err in ruling that section 2A4.1 permits an enhancement for a ransom demand and the offense of extortion.

▮▮▮▮ Rocha next contends that the district court erroneously enhanced his sentence under section 2A4.1(b)(1) for the ransom demand because the jury acquitted Rocha of conspiracy to kidnap. However, section 1B1.3(a) provides that all acts committed by the defendant, or aided and abetted by him or by a person for whose conduct he is legally accountable, and that are part of the same course of conduct or scheme as the convicted offense is relevant to sentencing. Since the jury found Rocha guilty of the offenses of (a) kidnapping/aiding and abetting, (b) conspiracy to extort and (c) extortion/aiding and abetting, the district court properly enhanced Rocha's sentence for the ransom demand.

## 2. Vulnerability of the Victim

Rocha, Padilla, Hinojosa and Gallegos contend that the district court erroneously enhanced their sentences based on vulnerability of the victim. Section 3A1.1 authorizes a two level increase when the defendant's criminal activity involves a victim who was unusually vulnerable due to age, physical or mental condition. The upward adjustment is appropriate "where an unusually vulnerable victim is made a target of criminal activity by the defendant." Sentencing Guideline § 3A1.1, commentary. Rocha, Padilla, Hinojosa and Gallegos argue that Baker was not vulnerable since he was nearly eighteen years old, his mother had moved to California leaving Baker to live with his grandfather and later with a friend's family, and, finally, the Government considered Baker mature enough to decide whether to consult an attorney during the pretrial conference.

▮▮▮▮ The determination as to vulnerability is a factual finding which the district court is in the best position to gauge since the district court has had the opportunity to observe the victim in court. *United States v. Mejia–Orosco*, 868 F.2d 807, 809 (5th Cir.1989).

> In general, vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly articulate completely. Certainly, a judgment as to vulnerability is not reducible to a calculation of the victim's age or to a diagnosis of the victim's disease.

*Id.* at 809. Thus, the district court's determination of the victim's vulnerability is entitled to due deference, as is the district court's determination of what the defendant knew or should have known. *Id.* at 810.

▮▮▮▮ After reviewing the trial transcript, we find that it is reasonable to believe that Baker was chosen as the kidnapping victim because of his young age. Without continually brandishing a weapon in Baker's presence to prevent him from escaping or alerting other persons, it appears that the defendants thought it was necessary to frighten Baker into believing

---

**36.** In arriving at this conclusion, we are mindful that a demand for ransom and extortion are not synonymous; conduct which amounts to a de-mand for ransom does not necessarily amount to extortion. The reverse holds true as well.

that "the Colombians" would capture and kill him if he escaped. Younger people, it might be thought, are generally more likely to believe such a story than older, more mature people. In imposing the adjustment for vulnerability of the victim, the district court noted that its decision was not based solely on Baker's age but also on the court's observation during the trial that Baker was still terrified. This observation lends support to the finding of vulnerability because it indicates that Baker was quite susceptible to intimidation with threats. Hence, applying the clearly erroneous standard, this Court is constrained to find that the district court appropriately applied the vulnerable victim enhancement to Rocha, Padilla, Hinojosa and Gallegos.

### 3. Acceptance of Responsibility

Padilla contends that the district court abused its discretion in refusing to reduce his guideline level by two points for acceptance of responsibility.[37] Section 3E1.1 provides that a court may reduce the offense level by two points "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." The standard of review under section 3E1.1 is more deferential than the clearly erroneous standard because

> the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation.

*United States v. Roberson*, 872 F.2d 597, 610 (5th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989) (quoting Sentencing Guidelines § 3E1.1, application note 5.)

The commentary to section 3E1.1 explains that proper considerations for determining whether a two point reduction for acceptance of responsibility is justified include voluntary termination or withdrawal from criminal conduct and voluntary surrender promptly after commission of the offense. Padilla contends that he is entitled to the two point reduction because he released Baker immediately upon learning that his activities were under investigation and voluntarily surrendered to authorities. While it is true that Padilla released Baker as soon as Padilla learned that law enforcement officers were investigating his actions, Padilla did not take Baker to any law enforcement officer but transferred Baker involuntarily to the control of another unidentified male. Moreover, Padilla did not surrender immediately; Padilla fled and later surrendered only after contacting his attorney. Because Padilla has made no statements regarding his involvement in the offenses and has taken no affirmative steps towards accepting responsibility, the district court's decision is not without foundation.

### III. CONCLUSION

For the reasons set forth above, the convictions and sentences of Ruben Rocha, Thomas Padilla, Hector Garcia–Garcia, Johnny Robert Hinojosa and Jose Santos Gallegos are affirmed.

AFFIRMED.

---

**37.** The district court explained that none of the defendants had exhibited any affirmative conduct to accept responsibility.