IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-4607
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BALDEMAR SAMBRANO VILLARREAL and
REYNALDO SAMBRANO VILLARREAL,

Defendant-Appellants.

_____

Appeals from the United States District Court for the
Eastern District of Texas

_____
( June 8, 1992 )

Before WILLIAMS, JOLLY, and HIGGINBOTHAM, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Baldemar Sambrano Villarreal and his brother Reynaldo Sambrano Villarreal appeal their convictions for the murder of Texas Constable Darrell Lunsford on January 23, 1991. They assert a number of reasons for reversal. Each is without merit. We AFFIRM.

I

On January 22, 1991, the Villarreals and Jesus Zambrano left Houston, Texas, in a 1982 Oldsmobile Cutlass in which was loaded approximately 31 pounds of marihuana that they planned to sell in Chicago. At about 1:23 A.M. on January 23, 1991, Darrell Lunsford, a Constable, stopped the car driven by Reynaldo Villarreal in

Garrison, Nacogdoches County, Texas. Before Lunsford left his patrol car, he activated a dash mounted video camera. The events that followed were recorded by that camera and a microphone worn by Lunsford.

Lunsford asked Reynaldo to step out of the car and, after inquiry, learned that Reynaldo had no driver's license. On questioning Reynaldo and the others, Lunsford received conflicting stories about where the three were traveling and who owned the car. Lunsford then requested permission to look in the trunk of the car. Baldemar then exited the vehicle, ignoring Lunsford's request that he stay in the car. As Lunsford was standing by the open trunk, Baldemar approached Reynaldo, said something in Spanish, and then lunged at Lunsford, grabbing his legs and wrestling him to the side of the road. As soon as Baldemar grabbed Lunsford, Reynaldo also attacked Lunsford and Zambrano got out of the car and joined the attack. The government asserts that Baldemar got control of Lunsford's pistol and shot Lunsford once in the back of the neck. The shot severed Lunsford's spinal cord and caused his almost instant death. Although the Villarreals aver that once the struggle began, "the facts become less clear," neither of the Villarreals denies the government's version of Lunsford's death. Accordingly, we accept that version.

Following the shooting, the three made a search for Baldemar's identification card, took Lunsford's flashlight, gun, and wallet and drove off. Soon, they were spotted by a Nacogdoches County

deputy sheriff who had passed the stopped cars while Lunsford had been speaking with Reynaldo. Deputy Sheriff Don Welch drove back to the scene of the stop and there found Lunsford's body. He radioed for help, then went in pursuit of the Oldsmobile's occupants. In the meantime, Zambrano and the Villarreals had abandoned the Olds and, taking the marihuana with them, were fleeing on foot. The three, at some point, abandoned the marihuana (later recovered by search teams). Ultimately, they were apprehended after an extensive manhunt.

## II

The Villarreals were indicted on three counts: Count One, for violation of 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 2 (murder of a law enforcement official while attempting to avoid apprehension for a drug trafficking offense; one aiding and abetting punishable as principal); Count Two, for violation of 21 U.S.C. 846 (conspiracy to possess marihuana with intent to distribute it); and Count Three, for violation of 21 U.S.C. 841(a)(1) (possession of marihuana with intent to distribute it). Counts Two and Three were dismissed before trial on the government's motion. After a trial in which Jesus Zambrano testified as a government witness, the jury convicted both Villarreals. Although the government had sought the death penalty for both defendants, the jury recommended against it and the court sentenced Baldemar Sambrano Villarreal to life imprisonment and Reynaldo Sambrano Villarreal to 40 years imprisonment. This appeal followed.

III

On appeal, the Villarreals raise two issues jointly and two issues individually. We first address the issues presented jointly and then turn to examine those presented individually.

A

Both Villarreals argue that their convictions should be reversed because the statute under which they were convicted does not state a crime. They argue that 21 U.S.C. § 848(e)(1)(B) is a sentencing provision that fails to state a substantive violation. The statute provides:

> [A]ny person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

In order to determine whether the provisions of § 848(e)(1)(b) set out a substantive crime, we may look for assistance to Garrett v. United States, 471 U.S. 773 (1985). In that case, Garrett argued that 28 U.S.C. § 848 (which at that time dealt only with a continuing criminal enterprise) punished conduct as a continuing criminal enterprise or as a predicate offense, but not both. The Court, however, said that "[t]he language, structure, and legislative history . . . show in the plainest way that Congress

intended the CCE provision to be <u>a separate criminal offense</u> which was punishable in addition to, and not as a substitute for, the predicate offenses." <u>Garrett</u>, 471 U.S. at 779 (emphasis ours). The Court focused on several points in its analysis: 1) The statute did not mention other offenses and set out a separate penalty "rather than a multiplier of the penalty established for some other offense." <u>Id</u>. at 781. 2) The statute referred to "convictions . . . under this section." <u>Id</u>. 3) The statute referred, in later subsections, to anyone "who is convicted under paragraph (1)." <u>Id</u>. 4) The statute "define[d] the conduct that constitute[d] being `engaged in a continuing criminal enterprise,'" and was "carefully crafted" in such a way that it was designed to reach a certain class of criminal. <u>Id</u>. 5) The legislative history referred to "conviction for [the] offense" provided for in § 848(a). <u>Id</u>. at 782. In applying <u>Garrett</u> to fathom the nature of § 848(e)(1)(B), we find that many of the same points are to be made.

This statutory section sets forth the elements of the crime (during commission of predicate drug felonies or avoidance of penalty for them/ killing/ a law enforcement officer, engaged in official duties or on account thereof), the <u>mens rea</u> required (intent), and a separate penalty therefor (imprisonment for 20 years to life, or the death penalty). Subsection 848(g) provides that the death penalty may be applied "for any <u>offense</u> under this section" only after a hearing. Subsection 848(h) requires notice

"[w]henever the Government intends to seek the death penalty for an offense under this section for which one of the sentences provided is death."  Subsections 848(i), (j), (n), and (p) refer to "an offense under subsection (e) of this section."  The statute "carefully craft[s]" a definition of the crime it seeks to punish, which stands alone.  The crime is based upon predicate offenses, but is clearly separate from and in addition to those offenses. Congress provided special procedural mechanisms to govern imposition of the penalties provided.  Finally, the history of the statute illustrates a Congressional intent to establish a separate offense.  Before 1988, § 848 embodied only a single statutory prohibition--it punished offenders who engaged in a continuing criminal enterprise.  After amendment by the Anti-Drug Abuse Act of 1988, Pub. L. 100-690, 102 Stat. 4382, 4387-88, § 848(e) had added a death penalty provision, not for CCE offenses, but for an entirely new group of offenses--intentional murders committed during certain specified felonies.

The Villarreals argue that subsection (e) is headed "Death penalty" and that the initial sentence in the subsection reads "In addition to the other penalties set forth in this section."  They urge that this clearly indicates that Congress intended subsection (e) as a sentencing provision to be applied to the specified drug felonies as an additional penalty available when a law enforcement officer is killed.  They also argue that the structure of § 848 makes it clear that it is simply a penalty provision, that

-6-

§ 848(e)(1)(B)'s language "commands, counsels, induces, procures, or causes" is mere surplusage if the subsection sets out a substantive offense, and that <u>Garrett</u> is both irrelevant and distinguishable. We are not persuaded. As the Villarreals point out, "the Supreme Court has . . . often held the best evidence of Congress' intent in passing any given statute is the language that Congress uses in that statute. <u>See</u>, <u>e.g.</u>, <u>Hallstrom v. Tillamook County</u>, 110 S.Ct. 304, 308-10 (1989)." We are convinced that Congress created a substantive offense in 21 U.S.C. § 848(e)(1)(B) and that its "language, structure, and . . . history . . . show in the plainest way that Congress intended [it] to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses." <u>Garrett</u>, 471 U.S. at 779.

B

The Villarreals next argue that "the prosecutor's use of peremptory challenges to exclude all potential jurors who expressed a general opposition to the death penalty violated those jurors' right, under the Fifth Amendment's Equal Protection component and under the First Amendment, not to be discriminatorily excluded from jury participation on the basis of their expression of a political belief." The essence of this argument is that potential jurors who expressed unalterable opposition to the death penalty were expressing a political opinion.

The defendants' argument projects an extension of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and <u>Powers v. Ohio</u>, 111 S.Ct. 1364

-7-

(1991), which make clear that the government cannot exercise its peremptory strikes in a racially discriminatory manner. In the present case, according to the Villarreals, jurors were excluded "from a significant opportunity to participate in the administration of justice on the basis of a characteristic unrelated to juror fitness"--the political belief that capital punishment is never appropriate. Political belief, their argument continues, is protected by the Constitution's First and Fifth Amendments in much the same manner as race. The Villarreals, therefore, were tried by a jury from which potential jurors were "discriminatorily excluded" and, under Batson and Powers, they are entitled to a new trial before a proper jury.

We are not persuaded. Batson and Powers address only racial discrimination. To hold that a venireperson's First Amendment protected view cannot constitute a basis for exercising a peremptory challenge is effectively to eliminate the peremptory challenge. We do not believe the Supreme Court intended this result. In any event, we decline to extend the Batson line of cases to apply to the circumstances presented here. See Palmore v. Sidoti, 466 U.S. 429, 432-33 (1984) (racial classifications "subject to most exacting scrutiny"). Political belief is not the overt and immutable characteristic that race is, and we decline to extend the Batson line of cases to this case.

-8-

C

We now turn to two issues raised by Baldemar Villarreal.[1]

(1)

First, he argues that the prosecutor improperly commented on his failure to testify. Baldemar quotes the prosecutor in closing argument:

> Watch as he moves to the back of the car as what in slow motion almost looks like a dance of death begins . . . Baldemar Villarreal has formed his intent. Watch . . . as he talks and says something to his brother. We don't know what he said. He does but we don't. He had turned his head away from . . .." (Emphasis in original.)

At that point, Baldemar continues, "appellant objected that such was an `improper comment on the Defendant's election not to take the stand.' The court sustained appellant's objection, instructed the jury, and overruled appellant's motion for a mistrial." (Emphasis ours.) Although "the Fifth Amendment prohibits a trial judge, a prosecutor or a witness from commenting upon a defendant's failure to testify in a criminal trial," United States v. Rocha, 916 F.2d 219, 232 (5th Cir. 1990) (citations omitted), "[a] comment regarding defendant's Fifth Amendment rights must have a clear effect on the jury before reversal is warranted." Id.

In this case, the court's instruction to the jury was plain, simple and strong:

> Ladies and gentlemen, you will disregard the comment of Mr. Rivers. You will recall the Court had instructed

---

[1]These arguments are adopted by Reynaldo Villareal by reference in his brief in accordance with Fed. R. App. P. 28(i).

-9-

you, you may not consider for any purpose the fact that Defendants did not testify in this case, and you will completely disregard Counsel's comment.

There is an "almost invariable assumption of the law that jurors follow their instructions." Richardson v. Marsh, 481 U.S. 200, 206 (1987). The defendant points to no other comment concerning the fact he did not testify. We do not think that Mr. Rivers's comment, especially in view of the court's clear instruction to the jury, had such a "clear effect on the jury" that reversal is warranted.

### (2)

Second, Baldemar argues that the government failed "to disclose exculpatory and impeachment evidence [and] violated due process." It appears to be his contention that such evidence might show that the victim, Constable Darrell Lunsford, had been dealing drugs. Consequently, the murdered officer may have been "acting out of a desire to obtain drugs for his own dealing when he stopped appellant," and not "in the performance of [his] official duties" as required by the statute. Baldemar further contends that the failure to disclose violated the requirement of Brady v. Maryland, 373 U.S. 83 (1963). Brady requires that "evidence that is both favorable to the accused and material either to guilt or punishment" be disclosed to the defendant. United States v. Bagley, 473 U.S. 667, 674 (1985).

Following a pre-trial motion for such disclosure, the district court made an in camera examination of material in the government's

-10-

possession and concluded that the material "is not <u>Brady</u> material and in my opinion it does not rise above the level of conjecture, hearsay or speculation and does not reach the point that it would place in question by admissible evidence whether Mr. Lunsford was performing his official duties on the occasion of his killing." The Supreme Court in <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985), stated that non-disclosed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. We have reviewed the material inspected in camera by the district court. Bearing in mind the standard set by <u>Bagley</u>, we cannot say that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[2]

D

We next turn to two additional issues presented by Reynaldo Villarreal.

---

[2]We point out that irrespective of the defendant's <u>Brady</u> contentions, the facts remain that Lunsford stopped the Villareals and Zambrano while in an official patrol car, while dressed in uniform, and for investigation of a traffic violation. <u>At the time of the fatal struggle</u>, Lunsford was acting as a law enforcement official conducting an official investigation. Thus, even if Lunsford's character and official conduct could be impeached, such impeachment would not be material because <u>at the time of the fatal struggle</u>, he was performing official duties.

(1)

He argues that "Congress intended Section 848(e)(1)(B) to apply only to `triggermen' and those `bosses' from whom the triggermen get their orders; since there was no evidence that Reynaldo Villarreal was either the triggerman or ordered the killing, the evidence was legally insufficient to convict him." By its plain language, § 848(e)(1)(B) applies to anyone who "intentionally kills . . . [a] local law enforcement officer engaged in . . . official duties." 18 U.S.C. § 2, part of the indictment, has been held to apply generally to all federal criminal statutes. United States v. Lennon, 751 F.2d 737, 741 (5th Cir.), cert. denied, 471 U.S. 1100 (1985). It provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the] commission" of "an offense against the United States" "is punishable as a principal." 18 U.S.C. § 2(a).

In reviewing a contention that the evidence in a case was insufficient to convict, we "must examine all the evidence and reasonable inferences in the light most favorable to the government and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. (Citation omitted.)" United States v. Rocha, 916 F.2d 219, 237 (5th Cir. 1990). A rational jury could have concluded that the evidence in this case clearly showed that Reynaldo intentionally joined in the struggle with Constable Lunsford and that he substantially assisted in Baldemar's successful attempt to

overpower and kill him. We have held that 18 U.S.C. § 2 imposes criminal liability on anyone who associates in a criminal venture, shares the principal's criminal intent, and engages in affirmative conduct designed to make the venture succeed. See, e.g., United States v. Medina, 887 F.2d 528, 532 (5th Cir. 1989). Thus, under the indictment and the applicable law, the evidence is sufficient to convict Reynaldo of aiding and abetting the crime specified in Section 848(e)(1)(B)--the murder of Constable Lunsford.

Reynaldo further argues, however, that by including the wording "counsels, commands, induces, procures or causes" as part of the statute, Congress clearly intended that only `bosses' or those who led others to kill were subject to the statute and not those who merely aided or abetted. We disagree. Although the plain language of the statute clearly is intended to reach "bosses" or "kingpins," as Reynaldo argues, it does not follow that Congress intended aiders and abettors to be excused. To the contrary, the language of the statute leads to the conclusion that Congress intended that aiders and abettors would be held criminally liable under the statute. Subsection (m) of the statute provides:

> In determining whether a sentence of death is to be imposed . . . the finder of fact shall consider mitigating factors, including the following:
> . . .
> (3) The defendant is punishable as a principal (as defined in section 2 of Title 18) in the offense, which was committed by another, but the defendant's participation was relatively minor . . ..

21 U.S.C. § 848(m)(3) (emphasis ours).  It is clear from this wording that Congress had in mind 18 U.S.C. § 2 and its part in criminal prosecutions, and that Congress did not intend to alter or eliminate that role.  We, therefore, reject Reynaldo's argument that the statute does not reach his conduct in this matter.

(2)

Reynaldo argues that the trial court's denial of his motion for severance violated his right to a fair trial and denied his Sixth Amendment right to compulsory process because it precluded his co-defendant's exculpatory testimony in his behalf.  In this respect, he first argues that he met the criteria of Fed. R. Crim. P. 14 regarding a severance and that the trial court abused its discretion in refusing to grant his motion for severance.  Second, he contends that the district court's denial of his motion for severance denied his right under the Sixth Amendment to compel the attendance of witnesses.

In addressing his first argument, we point out that "[i]t is the general rule that persons who are indicted together should be tried together. (Citations omitted)." United States v. Harrelson, 754 F.2d 1153, 1174 (5th Cir.), cert. denied, 474 U.S. 908 (1985). We note that Reynaldo correctly acknowledges that the district court's denial of a Rule 14 motion is reviewable only for an abuse of discretion.  "To demonstrate an abuse of discretion, a defendant must show that he suffered specific and compelling prejudice against which the district court could not provide adequate

-14-

protection, and that this prejudice resulted in an unfair trial."

Id. "Exculpatory testimony [of co-defendants] in some cases may provide the basis for a severance." United States v. Rocha, 916 F.2d 219, 231-32 (5th Cir. 1990). In order to establish a prima facie case warranting severance for the purpose of introducing exculpatory testimony of a co-defendant, the defendant must show:

    (1)  a bona fide need for the testimony;
    (2)  the substance of the testimony;
    (3)  its exculpatory nature and effect;
    (4)  that the co-defendant would in fact testify if severance
    were granted.

Id. at 232. In this case, the district court, after examining Baldemar under oath, stated that it was "not persuaded that the witness would, in fact, testify; would, in fact, waive his Fifth Amendment privileges." When reviewing rulings based on findings of fact, we must accept the district court's findings of fact unless they are clearly erroneous. See, e.g., United States v. Fernandez, 887 F.2d 564, 567 (5th Cir. 1989). When those findings are based "primarily on oral testimony and the trial judge has viewed the demeanor of the witnesses" "[t]he clearly erroneous standard is an especially rigorous one. (Citation omitted.)" Id. In this case, therefore, the trial court's finding is entitled to great deference. We certainly cannot say that we are "left with the `definite and firm conviction that a mistake has been committed.'" Thus, the district court was not clearly erroneous and we affirm the trial court's denial of Reynaldo's motion for severance based on Fed. R. Crim. P. 14.

-15-

We must, however, still deal with Reynaldo's contention that the denial of the motion for severance deprived him of his Sixth Amendment right to compel the attendance of witnesses--i.e., his right to compel Baldemar's attendance at a separate trial. Reynaldo argues that Baldemar would have testified that the three men in the car were unarmed and had formed no plan to kill in the event their marihuana load was discovered by authorities, that during the stop by Lunsford, Reynaldo did not tell anyone to kill the constable, that Reynaldo never touched the constable's gun, and that the unintelligible conversation between him and Reynaldo at the rear of the car before the attack on Lunsford concerned only Reynaldo's having failed to bring his driver's license. Reynaldo points to the sentencing phase of the trial where Baldemar testified that his statement to Reynaldo at the rear of the car concerned only Reynaldo's failure to bring his driver's license and where, Reynaldo says, the jury "specifically found that Reynaldo Villarreal did not intend to kill the officer." Thus, Reynaldo argues, he suffered a disadvantage because of "his inability to call Baldemar Villarreal, whose Fifth Amendment privilege included, at the joint trial, the right not to take the stand."

We remain unconvinced. First of all, Reynaldo cannot circumvent the district court's finding that Baldemar would not have waived his Fifth Amendment right at a separate trial for Reynaldo. Although Reynaldo argues that in the event of a separate trial, Baldemar could not have refused to take the stand and, once

there and having invoked the Fifth Amendment right, Reynaldo would have been entitled to "all favorable inferences that the jury may [have drawn] therefrom," we find this argument unavailing. The videotape in evidence shows Reynaldo attacking Constable Lunsford as soon as he was tackled by Baldemar and that Reynaldo repeatedly kicked Constable Lunsford in the head after he was wrestled down. The tape also shows that Reynaldo took Constable Lunsford's billfold after Lunsford was shot. No possible testimony by Baldemar is sufficiently ameliorating of Reynaldo's conduct that its absence establishes the "specific and compelling prejudice" necessary to demonstrate a violation of Reynaldo's right, under the Sixth Amendment, to a fair trial. Furthermore, the jury's failure, at the sentencing phase of the trial, to find Reynaldo guilty of the aggravating factor of "intentionally kill[ing]" Constable Lunsford is irrelevant to Reynaldo's Sixth Amendment claim: the jury was subject to completely different considerations at sentencing from those at the guilt phase of the trial. It may well have decided that Reynaldo aided and abetted the intentional killing of Constable Lunsford, and so was guilty of the offense charged, but that his conduct was not so morally culpable that it warranted the death penalty.

IV

Having considered the grounds of appeal presented by the appellants, Baldemar Sambrano Villarreal and Reynaldo Sambrano

Villarreal, we find no merit in them.  For that reason, the judgments of conviction of the district court are

A F F I R M E D.