67 F.3d 297
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Derek Lamont GOODING, a/k/a Zack, a/k/a Wolf, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Samuel Clive Phillips, a/k/a David, a/k/a Culture, a/k/a
Jungle, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Cashmere Cazeau, a/k/a Claudy, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Nigel Nicholas Douglas, a/k/a Junior, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
John Henry Lewis, a/k/a Murdock, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Terry Leon Edwards, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Jean Claude Oscar, a/k/a Chuck, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Arnold Mark Henry, a/k/a B, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Frantz Oscar, a/k/a Mark, a/k/a Oscar Frantz, Defendant-Appellant.
 Nos. 94-5405, 94-5406, 94-5407, 94-5408, 94-5409, 94-5410,
94-5444, 94-5445, 94-5448.
 United States Court of Appeals, Fourth Circuit.
 Sept. 11, 1995.
 
 ARGUED: Douglas Fredericks, Norfolk, Virginia; Walter Bruce Dalton, Norfolk, Virginia; Paul Henderson Ray, Virginia Beach, Virginia; Donald A. Harwood, New York, New York; John Orlin Venner, Virginia Beach, Virginia; David Wayne Bouchard, Chesapeake, Virginia, for Appellants. ON BRIEF: Duncan R. St. Clair, III, ST. CLAIR, MILLER & MARX, P.C., Norfolk, Virginia, for Appellant Cazeau; Lawrence H. Woodward, Jr., SHUTTLEWORTH, RULOFF, GIORDANO & KAHLE, Virginia Beach, Virginia, for Appellant Edwards; Danny Shelton Shipley, Norfolk, Virginia, for Appellant
 Robert Joseph Seidel, Jr., Assistant United States Attorney, Kevin Michael Comstock, Assistant United States Attorney, Norfolk, Virginia, for Appellee. ON BRIEF: Frantz Oscar. Helen F. Fahey, United States Attorney, Arenda L. Wright Allen, Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before HAMILTON, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 After a jury trial that lasted forty-two days, all nine defendants were convicted for conspiracy to distribute cocaine. See 21 U.S.C. Sec. 846. Eight of the nine defendants were convicted for distributing cocaine. See 21 U.S.C. Sec. 841(a)(1). Seven were convicted of using a firearm in relation to drug trafficking or a crime of violence. See 18 U.S.C. Sec. 924(c)(1). Three, Jean Oscar, Frantz Oscar, and Arnold Henry, were convicted of engaging in a Continuing Criminal Enterprise ("CCE"), murder in furtherance of a CCE, and making a place available for distribution of cocaine. See 18 U.S.C. at Secs. 848, 848(e)(1)(A), 856(a). And finally, Jean Oscar, alone, was convicted of being a felon in possession of a firearm. See 18 U.S.C. Sec. 922(g)(1).
 
 
 2
 After conviction, the jury considered, and rejected, the government's request that Jean and Frantz Oscar ("the Oscar brothers") and Arnold Henry be put to death. Subsequently, the court sentenced each defendant individually. The Oscar brothers and Arnold Henry, the capital defendants, all received life sentences plus 45 years. Derek Gooding and Samuel Phillips received life plus five years. Nigel Douglas received life. Cashmere Cazeau and John Lewis received a prison term of 25 years and four months. Terry Edwards was sentenced to 12 years and seven months.
 
 
 3
 All nine defendants appeal. Finding no error, we affirm.
 
 
 4
 I. Background.
 
 
 5
 The Oscar brothers, Arnold Henry, Derek Gooding, Samuel Phillips, and Eric Carroll, an unindicted co-conspirator, were founding members of a crack cocaine ring (the "group") operating out of Brooklyn, New York. In 1991 the group relocated to Norfolk, Virginia, where it opened a stash house at 635 West 36th Street. It established a crack sales operation with day and night shifts. The group's main distribution point was a pair of houses on West 34th Street in Norfolk. Later, the business expanded to include satellite locations in Virginia Beach, on 26th Street in Norfolk, and on Bagnell Road in Norfolk. With four distribution points and numerous employees, including defendants John Lewis, Nigel Douglas, Cashmere Cazeau and Terry Edwards, the group was moving over ten thousand dollars worth of crack every week.
 
 
 6
 The beginning of the end for the group came in the early morning hours of March 26, 1993. One of the group's employees, Gwendolyn Johnson, was robbed of her crack and $895. After the robbery, Johnson called Jean Oscar, the group's leader. Jean Oscar and his top lieutenants, Frantz Oscar and Arnold Henry, went immediately to Johnson's apartment at 1763 Campostella Road in Norfolk.
 
 
 7
 There, in front of at least six witnesses (including a 15-year-old boy), Jean Oscar started interrogating those present about the robbery. He focused his attention first on Alma Baker. During the interrogation, Jean Oscar became enraged and smashed Maggie Keene, an onlooker, on the back of the head with a pistol. Then Jean Oscar ordered his brother and Henry to bind Baker's hands and mouth with duct tape, take off her shoes and socks, expose the tip of an extension cord, and wrap the wire around her toes. At this point, Jean Oscar stopped asking questions and the three men tortured Baker with elec tric shocks. Baker's body shook from the repeated jolts of electric current. When they stopped torturing Baker, her hair was smoking.
 
 
 8
 As Baker lay in agony on the floor, the Oscar brothers and Henry turned their attention to Wayne Ashley, Baker's boyfriend. They forced Ashley to the floor, stripped him naked from the waist down, heated a fork red-hot on the kitchen stove, and then slapped the fork onto Ashley's exposed genitals.
 
 
 9
 Despite the torture, neither Ashley nor Baker identified the robbers. So Jean Oscar took a revolver from his brother, walked over to Baker, put the gun to her head, and killed her with a single round. After the killing Jean Oscar ordered the half-dozen observers to clean up the mess. He then put Baker's corpse, along with Ashley, into his car. That was the last time Ashley was seen alive.
 
 
 10
 At 3:30 a.m. witnesses heard gunshots near the CSX coal piers in Newport News. About 4:00 a.m. Wayne Ashley's body was discovered lying near the coal piers with two bullet holes in his head. At 7:00 a.m. Alma Baker's body was found near an exit ramp off Interstate 664 in Hampton, Virginia.
 
 
 11
 Meanwhile, police had talked to Maggie Keene, who was found huddled in the corner of a 7-11 store near Campostella Road. Keene's story led police to 1763 Campostella Road, the site of the murder and torture. By the time police arrived, however, group members had cleaned the apartment and concocted a story about how robbers had murdered Baker.
 
 
 12
 These events led police to focus more attention on Jean Oscar. On April 20, 1993, they stopped him driving a rental van on a drug run to New York City. During the stop, officers recovered a Chinese SKS assault rifle and $14,000 in cash. Later that day, the Norfolk Police Department executed search warrants at four locations in Norfolk: the two West 34th Street distribution points; the 26th Street satellite office; and 1009 Baltimore Street, Apartment B ("Apartment B"), the dwelling from which Jean Oscar left in his van.
 
 
 13
 The stop and the searches led to the arrest and indictment of all nine defendants. They stood trial and were convicted of the various crimes mentioned at the beginning. This appeal followed.
 
 
 14
 II. Challenges to the Search at Apartment B .
 
 
 15
 Defendants first contend that the search at Apartment B was issued and executed in violation of the Fourth Amendment. With respect to issuance, they argue that the warrant affidavit lacked sufficient facts to establish probable cause. With respect to execution, they argue that the police improperly exceeded the authorized scope of the search. We reject both assignments of error.
 
 
 16
 As for the argument that the warrant was improperly issued, we note that "our task is to determine whether the magistrate has a substantial basis for the decision" to issue the warrant. United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir.) (citation omitted), cert. denied, 114 S.Ct. 485 (1993). In making this determination, "we accord the magistrate's decision 'great deference,' " and we will interpret the affidavit supporting the warrant in a "commonsense manner." Id.
 
 
 17
 Applying these principles here, we find that the affidavit contained more than enough facts to support the magistrate's decision to permit a search at Apartment B. The affidavit related that Jean Oscar, with some of his associates, left Apartment B only four hours earlier to make a drug run to New York. It noted that Oscar and certain of his associates had been arrested in their rented van with an assault rifle and large quantities of cash. The affidavit also revealed that one of Jean Oscar's recently arrested subordinates had admitted that Oscar and his top lieutenants lived in the apartment. Finally, the affidavit offered corroborating observations by police (during surveillance) who had watched drug delivery vehicles come and go from 1009 Baltimore Street, Apartment B's location. These facts connected Apartment B to the leaders of an extensive and ongoing drug conspiracy within a recent time frame. They gave the magistrate a substantial basis to believe that drugs would be found in Apartment B. We therefore conclude that the warrant was properly issued.
 
 
 18
 To address defendants' argument that the warrant was improperly executed, we mention a few additional facts. The warrant itself authorized the police to search for cocaine. Four Norfolk police officers executed the search. They knocked on the door of Apartment B and announced their presence. No one answered. Instead, someone turned off the lights and someone peeked out a window. Using a battering ram, police then forcibly entered the apartment. Inside, the police detained defendants Samuel Phillips (after a brief fight) and Frantz Oscar. They then searched the apartment and seized an assault rifle, ammunition, pagers, two sets of digital scales, 237 grams of crack cocaine in 10 separate packages, records of drug transactions, photographs of people using drugs, photographs of armed persons, a camera, some undeveloped 35mm film, and a VHS video cassette.
 
 
 19
 The plain view doctrine permits the police to seize evidence not specified in a warrant only if (1) the officer seizing the evidence did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the incriminating nature of the evidence was immediately apparent, and (3) the officer had a lawful right of access to the object. Horton v. California, 496 U.S. 128 (1990).
 
 
 20
 The police entered Apartment B under a lawful warrant. That warrant authorized the police to search for cocaine. In conducting that authorized search, the police were permitted to examine any and all areas and items where the drug might readily be concealed. United States v. Barnes, 909 F.2d 1059, 1069 (7th Cir.1990) (citation omitted). Thus, the only issue in this case is whether the evidentiary value of the objects listed above was "immediately apparent" to the police. That is a factual determination. It depends on the totality of the circumstances and the credibility of the testifying officers. The district court was in the best position to assess these matters. Therefore, we will only reverse a determination that the nature of an item was "immediately apparent" in the event of clear error. See United States v. Gray, 83 F.2d 320 (4th Cir.1989) (holding that a district court's factual findings at a suppression hearing will be reviewed only for clear error).
 
 
 21
 Here, there was no clear error. The district court suppressed the camera, the undeveloped film and the VHS video cassette. It found that the incriminating nature of these objects was not readily apparent. In contrast, the district court permitted the prosecution to use the assault rifle, the ammunition, the pagers, both sets of digital scales, the records of drug transactions and the incriminating photographs. All of these items, except for the records, are so patently incriminating that they warrant no discussion. As for the transaction records, we do not perceive clear error in the district court's determination that the incriminating nature of those documents was immediately apparent to the officers who saw the documents as they searched for drugs. See Barnes, 909 F.2d at 1070.
 
 
 22
 III. Challenges to the Jury.
 
 
 23
 Defendants next contend that the prosecution exercised its peremptory strikes on the basis of race, in violation of the anti-discrimination rule laid down by Batson v. Kentucky, 476 U.S. 79 (1986). The six defendants who did not face the possibility of a death sentence further contend that the strikes for cause for anti-death penalty views denied them an impartial jury. We reject both assignments of error, in turn.
 
 
 24
 Batson established that the Constitution forbids the prosecution from striking jurors because of their race. 476 U.S. at 89. In this case the government exercised 18 peremptory strikes. Four of these strikes excluded blacks. Each of these persons expressed candid reservations about his or her ability to apply the death penalty. The prosecution also struck six whites who expressed similar reservations. Moreover, one of the four black jurors stricken knew some of the defense attorneys. Another of the four black jurors worked for a business which had recently been prosecuted by the U.S. Attorney's office in Norfolk. In any event, four of the twelve jurors who actually passed judgment in this case were black.
 
 
 25
 The government may use its peremptory challenges to exclude persons who express hesitancy about their ability to apply the death penalty. Brown v. Dixon, 891 F.2d 490, 496-98 (4th Cir.1989), cert. denied, 495 U.S. 953 (1990). Moreover, the government's right to use its peremptory challenges to exclude persons acquainted with defense counsel, or who may harbor bias against the prosecution, has never been questioned. Given these facts, it is not surprising that the district court rejected appellants' Batson challenge. We see no reason to disturb that decision on appeal.
 
 
 26
 The claim by the six non-capital defendants that the strikes for cause for anti-death penalty views deprived them of an impartial jury fails in light of Buchanan v. Kentucky, 483 U.S. 402 (1987). The claim arises from the fact that jurors, of any race, who said that they could not vote to impose death because of their religious or moral opposition to that penalty were struck from the venire for cause. To the extent that this argument is distinct from an argument that the non-capital defendants should have been tried separately from the capital defendants, Buchanan settles the matter. There, the Supreme Court rejected the notion that the Constitution requires separate juries to pass judgment over capital and non-capital defendants tried in the same proceeding. 483 U.S. at 414-420. This necessarily disposes of the non-capital defendants' claim that the strikes for cause violated their right to an impartial jury.
 
 
 27
 IV. Severance.
 
 
 28
 The six non-capital defendants further contend that they should have been tried separately from the capital defendants. They complain that the trial revolved around the brutal murders of Baker and Ashley. This, the non-capital defendants say, prejudiced them because they were mere "bit players," "unable to differentiate themselves in the jurors' minds from the stars." Brief of Appellants at 25. Moreover, the six non-capital defendants say that their defense was inconsistent with the capital defendants' defense. Neither contention requires reversal. The facts belie the assertion that the six non-capital defendants were merely bit players. Gooding, Phillips and Lewis were important figures in Jean Oscar's organization over an extended period of time. These men participated in major crimes in furtherance of the conspiracy. On one occasion, for example, the three men helped Jean Oscar beat Eric Carroll nearly to death. Douglas, the fourth man in this group, supervised a shift at one of the organization's distribution points. He managed a number of underlings and moved large amounts of drugs. Even Edwards and Cazeau were more than mere bit players; although not supervisors, they were certainly supporting actors in the conspiracy, working as salaried street pushers. In any event, the contention on appeal is that the non-capital defendants, as a group, were bit players and entitled to severance. As a group, however, the noncapital defendants were considerably more than bit players.
 
 
 29
 In general, defendants charged in the same conspiracy should be tried together. United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir.) (citation omitted), cert. denied, 112 C. Ct. 3051 (1992). Antagonistic or mutually exclusive defenses among co-conspirators do not automatically require severance. Zafiro v. United States, 113 S.Ct. 933, 938 (1993). Instead, Federal Rule of Criminal Procedure 14 requires severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." And, in any event (as in Zafiro ), the non-capital defendants have failed to articulate any specific instances of prejudice. Instead, they rest their argument on the conclusory allegation that the defenses of the two groups of defendants were antagonistic.
 
 
 30
 The non-capital defendants are entitled to severance only if they can make a strong showing of prejudice from a joint trial. See id.; United States v. Goldman, 750 F.2d 1221, 1225 (4th Cir.1984). A showing of compelling prejudice requires more than a showing that joinder makes for a more difficult defense. Id. "The fact that a separate trial might offer a better chance of acquittal is not a sufficient ground for severance." Id. Moreover, under Rule 14, the trial court's decision to grant or deny severance will not be overturned absent an abuse of discretion. Brooks, 957 F.2d at 1145.
 
 
 31
 Because we believe the non-capital defendants have understated their roles and because they have failed to identify with specificity the prejudice they suffered by a joint trial, we affirm the district court's decision to deny severance.
 
 
 32
 V. Challenge to a Jury Instructions.
 
 
 33
 Two defendants, Frantz Oscar and Arnold Henry, challenge the jury instructions that permitted the jury to convict them for aiding and abetting Jean Oscar in the murder of Alma Baker or Wayne Ashley in violation of 21 U.S.C. Sec. 848(e)(1)(A). Frantz Oscar and Henry argue that aiding and abetting liability is simply not available in prosecutions under this statute. The crime, they say, does not exist.
 
 
 34
 We disagree. Section 848(e)(1)(A) provides that any person who intentionally kills an individual in furtherance of a CCE must be imprisoned for at least 20 years and may receive the death penalty. There is no indication in the subsection that Congress intended to override the general provision that an aider and abettor "is punishable as a principal." 18 U.S.C. Sec. 2. Moreover, section 848(m)(3), in the same statute, provides:
 
 
 35
 In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider mitigating factors, including the following: ...
 
 
 36
 (3) The defendant is punishable as a principal (as defined in section 2 of Title 18) in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.
 
 
 37
 Section 848(m) demonstrates that Congress contemplated that aiders and abettors might face death for violating section 848(e)(1)(A). See United States v. Villarreal, 963 F.2d 725, 731 (5th Cir.) (holding that Congress intended accomplice liability to attach for violating section 848(e)(1)(B), which proscribes intentionally killing a law enforcement officer), cert. denied, 113 S.Ct. 353 (1992). Thus, when read as a whole, section 848 disproves Franz Oscar's and Henry's argument that they cannot be held criminally liable as aiders and abettors. Accordingly, the challenged jury instructions were proper.
 
 
 38
 VI. Remaining Issues.
 
 
 39
 We have reviewed carefully the remaining issues raised by appellants and find them to be without merit.
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 The convictions and sentences are affirmed.
 
 AFFIRMED