# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 00-50482
Summary Calendar
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JUAN CARLOS ZACARIAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
(EP-99-CR-1642-H)

_____

June 1, 2001

Before SMITH, BENAVIDES, and DENNIS,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

   Juan Zacarias appeals his conviction of, and
sentence for, hostage taking in violation of 18

   [*] Pursuant to 5TH CIR. R. 47.5, the court has
determined that this opinion should not be published
and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

U.S.C. § 1203. Finding no sentencing error,
and that any error in excluding evidence was
harmless, we affirm.

### I.

   Zacarias was convicted of taking part in the
kidnaping of Leonard Mickens. The kidnaping
occurred when Mickens drove his prospective
brother-in-law, Mario Sanchez, to a house in
Ciudad Juarez, Mexico. Mickens testified that
shortly before midnight, Mario Sanchez asked
his sister, Erica Sanchez, to drive him to

Juarez, but Mickens volunteered to drive, because he thought it was too late for Erica to make the trip.

Mickens drove to a house that Sanchez directed him to in Juarez, just across the border and not far from the Zaragoza Bridge. Once there, Mickens waited in his truck while Sanchez engaged in a long conversation with an unidentified man outside the house. Sanchez and the man then went into the house. Eventually, Mickens became impatient and went to the house to see whether Sanchez was ready to leave.

When he went inside the house, Mickens saw seven to ten men with guns. He tried to leave, but the men pushed him back into the house and restrained him with tape.

Mickens learned later that the men kidnaped him because Sanchez was involved in illegal drug-trafficking and owed the kidnapers $100,000 on a drug debt. Sanchez also was abducted, and, at the time of trial, his whereabouts were unknown.

Mickens testified that men with guns grabbed him and taped his body and head so that he could not see. They also "pok[ed]" him with guns while he was restrained with tape. Mickens did not testify that Zacarias was present when he was taken hostage. He did testify, however, that over an hour later, ZacariasSSwho was referred to as "Juan" and "Juanito,"SSwas present in the house where Mickens was being held and helped remove the tape from Mickens.

Another man referred to as "Chuy" also was present. Juan asked Mickens how much money he could give them. Mickens replied that he could give about $5,000. Juan then told Mickens that he also wanted the title to Mickens's Isuzu Rodeo.

Mickens testified that the next day he, Juan, Chuy, and two men with guns went to a restaurant in Juarez, where they discussed arrangements for getting the title and money. Mickens thought about running away at that point but did not, because of the presence of the two men with guns who were "body guarding" him.

Instead, Mickens offered to cross the border into the United States, get the money and title, and return. Unsurprisingly, his captors declined this offer. Instead, they let Mickens place a telephone call from a pay telephone to his friend Rod Redic in El Paso. Redic testified that he received a call at his girlfriend's house from a person wanting "$5,000 and title to the truck," but that he could not understand exactly what this person wanted him to do. Mickens then got on the line and asked Redic to bring $5,000 and the title to the Rodeo.

Mickens then relayed to Redic instructions he received from Juan, telling Redic to take the money and title just over the Zaragoza Bridge onto the Mexican side, where he was to meet Juan between 5:00 and 5:30 p.m. Mickens described Juan as a "big, heavy-set, black guy." Mickens then was taken back to the house, where he watched the Olympics on television. During this time, Chuy departed, leaving only Juan and the two men with guns holding Mickens.

Meanwhile, Redic collected the title and $4,000 from Mickens's father, who testified that he gave the money because Redic told him that "my son was being held by someone, and they demanded this money and title for his

2

release." Redic then added $1,000 of his own money and went across the Zaragoza Bridge, as instructed.

Mickens testified that about 5:00 p.m., Juan and one of the men with a gun left the house, presumably to meet Redic. Redic testified that after he had parked on the Mexican side of the bridge, a vehicle pulled up beside him; the driver motioned him to come over. Redic got into the car in which sat only one man, whom Redic later identified as Zacarias. Redic was told that his friend was all right, and he then handed over the money and title.

Mickens testified that the man with the gun who had gone with Juan returned to the house, and that the two men took him to the bridge, where he was released. He saw Redic there and walked over and got into Redic's car, whereupon they crossed the border.

During the investigation of the kidnaping, an informant told the FBI that Zacarias was involved, and provided an FBI agent with Zacarias's pager number. One of Mario Sanchez's sisters, who had been negotiating for his release, also provided the FBI with the same pager number, which was given to her by the person with whom she had been negotiating, who identified himself as "Juan." The pager number was listed in the name of Mario Zacarias, Juan's brother, and the address listed on the account was Juan's parents' house.

After collecting this information, the FBI compiled photo arrays of five individuals with similar builds and facial features to Zacarias. After being shown the photos separately, Mickens and Redic identified Zacarias as the kidnaper known as "Juan."

At trial, Mickens and Redic again identified Zacarias, and Zacarias was convicted of hostage taking. At sentencing, and over Zacarias' objections, the court applied a six level upward adjustment pursuant to U.S.S.G. § 2A4.1-(b)(1), because a ransom demand was made, and a two-level increase pursuant to U.S.S.G. § 2A4.1(b)(3), because a dangerous weapon was used.

## II.

Zacarias argues error as a matter of law in the six-level increase for the ransom demand. He contends that an upward adjustment can be made under § 2A4.1(b)(1) only if a ransom demand is made on the *government*.

We conduct a *de novo* review of the application of the Sentencing Guidelines. *See United States v. Rocha*, 916 F.2d 219, 242 (5th Cir. 1990). "The Sentencing Guidelines are subject to the rules of statutory construction." *Id.* at 243 (citation omitted). "[T]his court follows the clear, unambiguous language of the Guidelines if there is no discernible manifestation of contrary intent." *Id.*

Section 2A4.1(b)(1) provides that "[i]f a ransom demand or a demand upon government was made, increase by 6 levels." Zacarias argues that this means that if a ransom demand or other demand was made on the government, an increase is applicable, but that the increase in no way applies to cases in which ransom demands are made on individuals. He arrives at this conclusion by citing the "doctrine of the last antecedent" and then giving this doctrine its opposite meaning.

Zacarias quotes *United States v. Campbell*, 49 F.3d 1079, 1086 (5th Cir. 1995), which states that "qualifying words, phrases, and

clauses are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to . . . others more remote." Just so, and because of the doctrine of the last antecedent, Zacarias's interpretation is completely wrong.

The words "upon government" qualify only "demand" but not the disjunctive "ransom demand" that appears before the "or." *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (stating that terms connected by the disjunctive are to be given separate meanings). The court correctly applied the six-level increase for a ransom demand.

### III.

Zacarias contends that the court erred in making a two-level increase pursuant to § 2A4.1(b)(3) for the use of a dangerous weapon. He argues that he did not possess or use a weapon during the commission of the crime and that, because he was not indicted for conspiracy, he cannot be held accountable for the conduct of the men who had guns.

We review *de novo* any legal conclusions regarding application of the guidelines. *See United States v. Gonzalez*, 996 F.2d 88, 91 (5th Cir. 1993). Section 2A4.1(b)(3) provides that "[i]f a dangerous weapon was used, increase by 2 levels." "Use" of a dangerous weapon includes the discharge of a firearm or conduct that amounts to "more than brandishing, displaying, or possessing a firearm or other dangerous weapon." § 2A4.1, comment. (n.2); U.S.S.G. § 1B1.1, comment. (n.1(g)).

The district court correctly concluded that the use of guns to hold Mickens hostage was a "use" under the guidelines. Zacarias does not disagree with this conclusion but avers that the use of guns by others cannot be attributed to him for sentencing purposes. Unfortunately for Zacarias, this interpretation ignores the plain language of the guidelines.

Section 1B1.3(a)(1)(A) allows the court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" in determining relevant conduct for sentencing guideline purposes. Further, § 1B1.3(a)(1)(B) states that "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" constitute relevant conduct to be considered by the court. Finally, the defendant can be held accountable for the conduct of others whether or not the defendant is charged with a conspiracy. *See* § 1B1.3(a)(1)(B), comment. (n.2).

Use of a dangerous weapon was more than reasonably foreseeable to Zacarias, who, in fact, had actual knowledge that dangerous weapons were being used as he directed the holding and ransoming of Mickens. Thus, at best Zacarias "aided" and "abetted" the use of guns in holding Mickens, and, more probably, he "counseled, commanded" and "induced" the use of the firearms. See § 1B1.3(a)(1)(A); *cf. United States v. Aguilera-Zapata*, 901 F.2d 1209, 1212-16 (5th Cir. 1990).

### IV.

Zacarias contends that the court deprived him of his Sixth Amendment right to confrontation and cross-examination when it refused to admit into evidence a tape recording of a conversation between the victim, Mickens, and Francisco Sanchez, the brother of Mario Sanchez, the other kidnaping victim. Zacarias contends that the tape would have shown that Francisco Sanchez threatened

Mickens by saying that someone had to "pay for what happened to his brother," and that the tape would have impeached Mickens's testimony by showing that fear of Francisco Sanchez gave Mickens a motive to testify that Zacarias was a kidnaper. Zacarias contends that the relevant evidence on the tape would have discredited the other evidence against him, which consisted only of "weak out of court identifications and questionable in court identifications."

The government contends that the court properly excluded the recording, because the information on the tape was not relevant, was hearsay, and was only a collateral matter for impeachment. The government contends, in the alternative, that even if the exclusion of the evidence was error, the error was harmless, because the evidence that identified Zacarias was strong and was corroborated by other evidence.

A witness's possible bias, prejudice, or motivation for testifying is relevant evidence. *See United States v. Alexius*, 76 F.3d 642, 645 (5th Cir. 1996). The exclusion of evidence relevant to the bias or ulterior motive of a witness may violate the Sixth Amendment. *United States v. Fortna*, 796 F.2d 724, 734 (5th Cir. 1986). Nevertheless, a court retains broad discretion "in restricting the scope of cross-examination, including how bias may be proved." *Id.* (citations omitted).

We review a restriction on the scope of cross-examination only for abuse of discretion. *Alexius*, 76 F.3d at 644. "[E]videntiary rulings constitute reversible error only when they affect a defendant's substantial rights." *Id.* (citation omitted).

Zacarias sought the admission into evidence of a tape recording of a telephone conversation between Mickens and Francisco Sanchez. Zacarias argued that Francisco Sanchez stated on the tape that he was going to "get everybody" in retaliation for his brother's kidnaping. Zacarias argued that Francisco Sanchez was dangerous and terrifying, that his entire family was afraid of him, and that he threatened Mickens. Zacarias argued that the tape constituted relevant evidence of Mickens's motive for testifying against Zacarias, *i.e.*, to show that "somebody needs to go down on this case."

The court offered to admit a portion of the recording that described Zacarias, identified as Juanito on the tape, as a fat person, because at trial, Zacarias was "not so fat." The court concluded that nothing else on the tape was admissible "for any conceivable purpose." The court explained that evidence of Francisco Sanchez's making threats was not admissible or relevant, because he was not involved in the case.

Zacarias's attorney cross-examined Mickens concerning his fear of Francisco Sanchez, and Mickens said that he was not afraid. When he was asked whether everyone in the Sanchez family was afraid of Francisco Sanchez, Mickens testified: "I wouldn't say everybody's afraid of him. I will say he's crazy. But I wasn't afraid of him or nothing like that." Mickens reiterated that he did not have any reason to be afraid of Francisco Sanchez.

At that point, Zacarias's counsel referred to the tape recording of the telephone conversation between Mickens and Francisco Sanchez. Mickens denied having a telephone conversation with Francisco Sanchez. Later, during the defense's presentation of its case, Mickens testified that he did not remember

having the telephone conversation with Francisco Sanchez.

A portion of the tape was then played while the jury was present. After hearing a portion of the tape, Mickens identified his voice and Francisco Sanchez's voice, and Mickens identified another person who was present during the telephone conversation that had been recorded.

Zacarias's counsel asked Mickens whether Francisco Sanchez had threatened him and "everyone else in the world" during the recorded conversation. Mickens denied that Francisco Sanchez had threatened him. Zacarias's attorney offered the tape as impeachment evidence. The court stated that "it would be impeachment as to a completely collateral matter, so it's not admissible." The court, however, allowed Zacarias to include the tape as a record exhibit. On redirect, Mickens admitted that "people are afraid" of Francisco Sanchez but again denied that he was afraid of him.

A witness's biases and motivation for testifying are "always relevant as discrediting the witness and affecting the weight of his testimony." *Alexius*, 76 F.3d at 645 (citation and internal quotations omitted). Assuming *arguendo* that the district court erred by ruling that the alleged impeachment portion of the tape recording was not admissible, the exclusion of the evidence was harmless, because "it is clear beyond a reasonable doubt that the error did not contribute to the verdict." *Id.* at 646 (citation omitted).

Zacarias did not testify; his only defense was erroneous identification. In a pre-trial photographic line-up and at trial, Mickens identified Zacarias as one of the kidnapers.

Mickens's friend, Roderick Redic, who delivered the ransom and the truck title in exchange for Mickens's release, also identified Zacarias in a pretrial photographic line-up and at trial.

Moreover, an FBI agent testified that a government informant had connected Zacarias to the kidnaping and gave him a pager number that matched a pager number that the agent had been given by another source. The pager was registered to Zacarias's parents' house. The informant provided corroboration that Zacarias was involved in the kidnaping through telephone calls made by the informant to the pager number.

Although Zacarias asserts that the out-of-court and in-court identifications were weak and questionable, the record does not support this assertion. The eyewitnesses did not hesitate in their identifications of Zacarias, and nothing in the record provides reason to question the reliability of the photo identification. Finally, Zacarias's counsel also took the opportunity to cross-examine Mickens about his fear of Francisco Sanchez.

Even if Mickens's motive for identifying Zacarias as one of his kidnapers was fear of Francisco Sanchez, the fact remains that Redic separately identified Zacarias as the one to whom he paid the ransom. Thus, for Zacarias's theory of defense to be borne out, there also must have been a reason for Redic not only to lie about Zacarias's being the ransomer, but there must also have been a reason for Redic to pick out Zacarias's photograph from the photo line-up. Zacarias provided no evidence casting doubt on Redic's testimony, nor could he dispute the government's corroborating evidence that a pager linked to Zacarias was used as part of the ransom

negotiations surrounding the holding of Mario Sanchez.

There was ample evidence upon which to convict, and, therefore, it is plain beyond a reasonable doubt that any fear Mickens had of Francisco Sanchez did not contribute to the verdict. The exclusion of the alleged impeachment evidence on the tape recording was harmless.

## V.

In his statement of the case, Zacarias makes a passing charge that the evidence against him was insufficient to support his conviction, but he does not mention this challenge elsewhere in his brief. We deem this issue waived, because it was not adequately briefed. *See*, *e.g.*, *United States v. Mullin*, 178 F.3d 334, 340 n.1 (5th Cir. 1999).

AFFIRMED.